STATE

v.

James M. THORPE.

No. 79–361–C.A.

Supreme Court of Rhode Island.

May 8, 1981.
Reargument Denied May 28, 1981.

Dennis J. Roberts II, Atty. Gen., Theodore W. Travis, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, John A. MacFadyen III and Paula Rosin, Asst. Public Defenders, for defendant.

## OPINION

KELLEHER, Justice.

The defendant, James Thorpe (Thorpe), was originally charged with the murder of his four-month-old daughter. Presently he is before us on a two-issue appeal following a Superior Court verdict in which the jury found that the defendant was guilty of committing an assault and battery upon his daughter. The verdict came after the trial justice had granted Thorpe's motions for judgment of acquittal in regard to first- and second-degree murder, and the case was presented to the jury on the charge of manslaughter and the lesser-but-included offense of assault and battery. Thorpe was fined $500 and sentenced to one year at the Adult Correctional Institutions. The sentence was stayed pending Thorpe's appeal.

The facts reveal an unfortunate sequence of events. Dawn Marie Lincoln was born in April of 1977 to Loretta Lincoln (Loretta) and Thorpe. Loretta was seventeen; and Thorpe, who was taking a physical-education course at a local university, was twenty. The three lived together in a Providence apartment. On July 15, 1977, Loretta was showing her baby to a friend. While she was carrying Dawn Marie from one room to another, the baby's head bumped against a door casing. She took Dawn Marie to the emergency room of the Rhode Island Hospital. The baby was released an hour later.

About two weeks later, on the morning of July 29, 1977, Loretta left the apartment, having just bathed and dressed Dawn Marie. As Loretta was leaving the apartment, Thorpe was preparing to begin his regular weight-lifting program. Approximately two and a half hours later, Loretta returned to the apartment with a girl friend. The seven-pound baby was not awake and appeared to be sobbing. When Loretta asked Thorpe what had happened, he told her that Dawn Marie had been crying a lot and must have cried herself to sleep.

After Loretta had expressed some concern, Thorpe drove her and Dawn Marie to the office of the child's pediatrician, Dr. John Montgomery. The physician examined the baby and observed reddish markings on the buttocks area but could not say whether such markings were indicative of slight, moderate, or severe force. Doctor Montgomery called the Providence fire department's rescue squad, which in turn transported Loretta and Dawn Marie to Rhode Island Hospital's emergency room. Sometime between 1:30 and 2 o'clock of the afternoon of July 29, Dr. Paul Pitel examined Dawn Marie at the hospital's pediatric-care unit. Doctor Pitel told the jury that there was a laceration and some hemorrhaging on the front side of the brain and that the bruises on the left buttock were caused by a blow of "rather severe" force.

Loretta testified that when she took the baby to the hospital, she notice a hand print on her daughter's buttocks. The baby's mother also stated that she had not observed any bruises or marks on Dawn Marie

when she had bathed the child earlier on July 29.[1]

When Loretta returned to the apartment after having left Dawn Marie at the hospital, she asked Thorpe whether or not he had struck the child. Thorpe denied hitting the baby; but subsequently, in giving a statement to the detectives, he conceded that he had hit the baby and added to the statement the following personally typed explanation for his behavior:

"When I lift weights I get all my frustrations out. During this time I am very high strung. The baby wouldn't stop crying so I spanked her ass. I didn't realize how hard I hit her."

Dawn Marie's condition grew progressively worse, and she died on August 9, 1977.

Thorpe attempted to prove that the baby's death was not caused by his spanking but rather by previous injuries the baby had suffered. Thorpe referred to a third incident in which the baby had struck her head. This occurred just three or four days prior to July 29. Loretta was allegedly holding the baby in her arms in the kitchen and then dropped the baby on the floor. Thorpe testified that the baby's behavior worsened after this fall—the baby cried continually and could not hold down her formula.

During cross-examination Thorpe conceded that he had never mentioned the fall episode to either the police or the hospital personnel. He also admitted that it was possible that in trying to quiet Dawn he had struck the baby more than once. Thorpe agreed with the prosecutor's suggestion that once a weight-lifting routine has begun, it should be continued on to its completion. Thorpe also said that during the routine, he did become "very high strung."

Thorpe first takes issue with the trial justice's charge on assault and battery. The trial justice gave the following charge:

"Also included in the facts of this case is a lesser offense. Assault and battery. A battery or assault and battery is the *unlawful* and *wilfull* touching of the person of another by the aggressor or by some subsequent object or force put in motion by such aggressor. You may consider this charge if you find the defendant not guilty of manslaughter. A person commits the crime of battery who *knowingly* and *intentionally* and unlawfully makes physical contact with another. The question that you must resolve is was the touching unlawful. That means without justifiable cause. *You may take into consideration in making that determination all of the conduct of the defendant* as to whether the touching was lawful or not. I instruct you that under the law of the State of Rhode Island *no one has the right to inflict excessive corporal punishment* upon a child. So, ladies and gentlemen of this jury, if you find that the state has proven beyond a reasonable doubt that the defendant committed the crime of assault and battery, or battery, then you must return a verdict of guilty. And, conversely, if you find that the state has failed to prove each and every essential element of a crime of assault and battery or battery beyond a reasonable doubt then equally it is your duty to return a verdict of not guilty." (Emphasis added.)

Thorpe argues that the trial justice erred when he failed to instruct the jurors that they would have to find that Thorpe acted *maliciously* when he spanked his daughter, in order to find him guilty of assault and battery. According to Thorpe, "malice" requires a higher threshold of culpability than "excessive." In addition, he claims that the term "excessive" gave the jury no indication of the requisite state of mind necessary to support an assault-and-battery conviction. Thorpe submits that the instruction given did not permit the jury to accept his theory: that he spanked Dawn Marie but

---

1. Another witness was Dr. William Q. Sturner, the State Medical Examiner, who performed an autopsy on Dawn Marie on August 10, 1977. He said that it was quite unusual to have damage to the brain and find no visible injury to the head. However, Dr. Sturner attributed the infant's death to a brain hemorrhage that could have been caused by a blow from a second party.

once in an attempt to stop her hysterical shrieking by startling the infant so that she would calm down.

■ Although some believe that the doctrine "to spare the rod is to spoil the child" is outmoded, courts still recognize that some degree of corporal punishment is permissible. Accordingly, it is conceded that a parent has a right to use reasonable and timely punishment as may be necessary to correct faults in his/her growing children. *State v. Bell*, 223 N.W.2d 181 (Iowa 1974); *Carpenter v. Commonwealth*, 186 Va. 851, 44 S.E.2d 419 (1947); *see* Annot., 89 A.L.R.2d 396 (1963). Within the bounds of moderation and for the purpose of the best interests of the child, the parent is entitled to be the judge of what is required and the means to be adopted. *State v. Fischer*, 245 Iowa 170, 176–78, 60 N.W.2d 105, 108–09 (1953). As a general rule,[2] a parent or one in loco parentis may inflict *reasonable* corporal punishment. *See Ingraham v. Wright*, 430 U.S. 651, 661, 674, 97 S.Ct. 1401, 1407, 1414, 51 L.Ed.2d 711, 724, 732 (1977); *People v. Ball*, 58 Ill.2d 36, 317 N.E.2d 54 (1974); *State v. Coombs*, 381 A.2d 288, 289 (Me.1978); *Bowers v. State*, 283 Md. 115, 126, 389 A.2d 341, 348 (1978); Annot., 89 A.L.R.2d 396 (1963).

However, it is clear that although the parent may use the rod, such an activity must be done with moderation. If a parent inflicts *excessive* or unreasonable corporal punishment upon his/her child, the parent is subject to criminal liability. *People v. Ball*, 58 Ill.2d 36, 317 N.E.2d 54 (1974); *State v. Bell*, 223 N.W.2d 181 (Iowa 1974); *State v. Coombs*, 381 A.2d 288 (Me.1978); *Bowers v. State*, 283 Md. 115, 389 A.2d 341 (1978); *Carpenter v. Commonwealth*, 186 Va. 851, 44 S.E.2d 419 (1947); Annot., 89 A.L.R.2d 396 (1963).

■ The test of unreasonableness is met at the point at which a parent ceases to act in good faith and with parental affection and acts immoderately, cruelly, or mercilessly with a malicious desire to inflict pain, rather than make a genuine effort to correct the child by proper means. *State v. Hunt*, 2 Ariz.App. 6, 20, 406 P.2d 208, 222 (1965). There is no inflexible rule that defines what, under all circumstances, is unreasonable or excessive force. The accepted degree of corporal punishment must vary in relation to the sensitivity and character of the child, the child's age, sex, physical condition, as well as in relation to the particular offense for which punishment is to be meted out. *Id.; Carpenter v. Commonwealth*, 186 Va. 851, 44 S.E.2d 419 (1947).

■ As mentioned, the clear weight of authority holds that a parent is subject to criminal liability when he/she inflicts *excessive* corporal punishment. *Excessive* corporal punishment is a proper standard because it accommodates the respective interests of the parent, the child, and society. Some courts do not differentiate between malice and excessiveness, implicitly holding that excessive punishment demonstrates malice or cruelty. *State v. Hunt*, 2 Ariz.App. 6, 406 P.2d 208 (1965); *Bowers v. State*, 283 Md. 115, 389 A.2d 341 (1978); *Commonwealth v. Moore*, 261 Pa.Super. 92, 97–98, 395 A.2d 1328, 1331 (1978); *Commonwealth v. Kramer*, 247 Pa.Super. 1, 11–12, 371 A.2d 1008, 1013 (1977). Other courts have differentiated between excessiveness and malice and have rejected the theory submitted by Thorpe. Those courts hold that *excessiveness* demarks the proper boundary, not malice. *People v. Ball*, 58 Ill.2d 36, 317 N.E.2d 54 (1974); *Carpenter v. Commonwealth*, 186 Va. 851, 44 S.E.2d 419 (1947). We need not decide whether there is a difference between "malice" and "excessive" in this context, for we believe that when a parent inflicts *excessive* corporal punishment, he should be criminally liable. "Excessive" is sufficient to convey the meaning that a parent may inflict corporal punishment to discipline and correct the child but may not do so to vent his/her own anger or frustration on the child. *State v. Fischer*, 245 Iowa 170, 60 N.W.2d 105 (1953); *Carpenter v. Commonwealth*, 186 Va. 851, 44 S.E.2d 419 (1947).

---

2. This was also the rule at common law. *See Bowers v. State*, 283 Md. 115, 126, 389 A.2d 341, 348 (1978).

Accordingly, Thorpe received the instruction to which he was entitled. He had no right to inflict excessive corporal punishment upon Dawn Marie. Here, the jury could have accepted Thorpe's testimony regarding his technique for stopping the crying, but the jury, with reason, chose to reject his version of what occurred when Loretta left the apartment on July 29 and he began his weight-lifting regimen.

In speaking about proof beyond a reasonable doubt, the trial justice told the jury: "[T]he state must prove the guilt of the defendant of the crime charged or included in the charge, beyond a reasonable doubt, and the state has the burden of proving each and every essential element or part of such a crime. I will explain to you the essential elements of the crime later. You will notice that I said, 'beyond a reasonable doubt', and I did not say beyond all doubt. It is virtually impossible to prove anything beyond all doubt. Again, remember, the defendant *is not required to prove his innocence* nor was he required to offer evidence of any kind, *nor disprove or explain anything.* Now, it's just—what does beyond a reasonable doubt mean? The courts, for years, have tried to arrive at a practical and workable definition of that phrase. Most courts have concluded that it's almost impossible to give an exact and precise definition, but in spite of all our frustrations we try to make what we hope is an intelligent comment on the subject.

"Proof beyond a reasonable doubt does not mean proof beyond all doubt. It does not mean proof beyond all possible doubt. It does not mean that the state must prove the essential elements of the case beyond a shadow of a doubt. It does not mean that at all. To be that convinced we would have had to have been eye-witnesses. But, a reasonable doubt is *a doubt based on evidence or lack of evidence.* A reasonable doubt is not a fanciful or possible or speculative doubt. It must be more than that. *A reasonable doubt is a doubt founded in reason* and not a doubt arising out of whimsy or caprice. *Proof beyond a reasonable*

*doubt* exists when after you have thoroughly and conscientiously considered and examined all of the evidence that has been presented to you, and *your mind is left in such a condition that you feel an abiding conviction of the correctness of the state's claim that the defendant is guilty of the charge.* To put it another way, if after you have carefully reviewed and considered all of the evidence in this case, *if you are convinced that the defendant did, in fact, do the actions* as charged by the state then *proof beyond a reasonable doubt has probably been established.* Mere suspicion, however strong, cannot sustain nor justify a verdict of guilty. Simply stated, the law provides *that the defendant is entitled to the benefit of a doubt, based on reason, but he is not entitled to the benefit of any and all doubt."* (Emphasis added.)

The right to proof beyond a reasonable doubt is indispensible for a criminal defendant. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, 375 (1970). Discussion of the concept is perhaps the most important aspect of the closing instruction to the jury in a criminal trial. *Dunn v. Perrin,* 570 F.2d 21, 25 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978). Unfortunately, "reasonable doubt" is at best a difficult concept to explain to a lay jury. *Id.* at 23. Indeed, some courts have refused to define the words in order to avoid confusion. *See id.* at 23; *Holland v. United States,* 209 F.2d 516, 522–23 (10th Cir.), *aff'd,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). However, under the federal rule and in this state, the defendant is entitled to an explanation. *Holland v. United States,* 209 F.2d 516 (10th Cir. 1954); *State v. Mantia,* 101 R.I. 367, 375–76, 223 A.2d 843, 848 (1966).

The instruction here was proper for the following reasons. First and most important, the charge emphasized that Thorpe did not have to prove or disprove anything and that the state bore the burden of proof beyond a reasonable doubt. The instruction defined this burden in terms of requiring an "abiding conviction" of the correctness of the state's claim. We believe that this was an adequate phrase to delineate the state's

heavy burden of proof. *Cf. Dunn v. Perrin*, 570 F.2d at 23–24. The Court in *Dunn* held that the trial court was clearly wrong in giving the following instruction for reasonable doubt:

> "It [reasonable doubt] does not mean a trivial or a frivolous or a fanciful doubt nor one which can be readily or easily explained away, but rather such a *strong and abiding conviction as still remains after careful consideration of all the facts and arguments * * *.*" (Emphasis added.)

According to the First Circuit in *Dunn*, the above definition of reasonable doubt was the "exact inverse of what it should have been." We agree with the *Dunn* opinion insofar as it requires a juror to have an "abiding conviction" as to the defendant's guilt rather than an "abiding conviction" as to the existence of a reasonable doubt.

■ Second, the trial justice was also correct in stating that reasonable doubt is "a doubt based on evidence or lack of evidence." This is indeed the essence of the term "reasonable doubt." *See Dunn v. Perrin*, 570 F.2d 21 (1st Cir. 1978); *Holland v. United States*, 209 F.2d 516 (10th Cir. 1954); *Sulie v. State*, 269 Ind. 204, 208–210, 379 N.E.2d 455, 457 (1978). Furthermore, the instruction was not inadequate because it referred to a reasonable doubt as a doubt based upon reason.[3] Such a definition has been upheld up numerous courts. *Dunn v.*

*Perrin*, 570 F.2d at 23 n.2; *United States v. MacDonald*, 455 F.2d 1259, 1262–63 n.4 (1st Cir. 1972); *Freeman v. United States*, 158 F.2d 891, 896 (9th Cir. 1946), *cert. denied*, 331 U.S. 805, 67 S.Ct. 1187, 91 L.Ed. 1827 (1947). Nor did the trial justice err in stating that "beyond a reasonable doubt"[4] did not mean beyond "all possible doubt" or beyond a "shadow of a doubt." This statement is an acceptable way of declaring that a reasonable doubt is not a whimsical or a fanciful one. *Tsoumas v. State*, 611 F.2d 412 (1st Cir. 1980); *Russell v. United States*, 429 F.2d 237 (5th Cir. 1970); *State v. Cugliata*, 372 A.2d 1019 (Me.1977).

■ In the case at bar, the instruction on "proof beyond a reasonable doubt" reminded the jury of the state's heavy burden. *United States v. Lawson*, 507 F.2d 433 (7th Cir. 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). Taking the charge as a whole, we accordingly hold that the trial justice properly informed the jury of the standards by which it was to determine Thorpe's guilt or innocence. *See State v. Robalewski*, R.I., 418 A.2d 817, 821 (1980); *State v. Mantia*, 101 R.I. 367, 375–76, 223 A.2d 843, 848 (1966).

The defendant's appeal is denied and dismissed, and the judgment of conviction appealed from is affirmed.

MURRAY and SHEA, JJ., did not participate.

---

3. If "a doubt based upon reason" was the only information given regarding reasonable doubt, we would be faced with a different question. But this definition, when combined with the charge that reasonable doubt must be based on evidence or lack of evidence, is sufficient.

4. We would note that recently much criticism has been directed at attempts to define "reasonable doubt" as a "substantial doubt." *United States v. Zimeri-Safie*, 585 F.2d 1318 (5th Cir. 1978); *United States v. Wright*, 542 F.2d 975 (7th Cir. 1976); *United States v. Atkins*, 487 F.2d 257 (8th Cir. 1973); *see Taylor v. Kentucky*, 436 U.S. 478, 488, 98 S.Ct. 1930, 1936, 56 L.Ed.2d 468, 477 (1978); *Dunn v. Perrin*, 570 F.2d 21, 23 (1st Cir. 1978); *United States v. Alvero*, 470 F.2d 981 (5th Cir. 1972); *State v. Harrison*, 149 N.J.Super. 220, 373 A.2d 680 (1977); *State v. McDonald*, 89 Wash.2d 256, 571 P.2d 930 (1977). Although in *State v. Mantia*, 101 R.I. 367, 376, 223 A.2d 843, 848

(1966), we equated "a reasonable doubt" with "a substantial doubt," we believe the critical comment to which we have referred has merit. As one judge has observed:

> " 'Reasonable' and 'substantial' are not synonymous, as can be seen by referring to any of the standard dictionaries. The point was well put by counsel in argument recently where he pointed out that if one had to undergo a serious operation and were querying the doctor as to the prospects for a successful outcome, how differently the person would feel if the doctor told him there was only a reasonable chance of success as opposed to being told there was a substantial chance of success." *State v. Davis*, 482 S.W.2d 486, 490 (Mo.1972) (Seiler, J., concurring in the result).

Hereafter, trial justices, in discussing the reasonable-doubt doctrine, shall omit any reference to "substantial doubt."