STATE

v.

Paul COURTEAU.

No. 81–469–C.A.

Supreme Court of Rhode Island.

June 17, 1983.

Reargument Denied July 8, 1983.

Dennis J. Roberts II, Atty. Gen., Anthony F. DelBonis, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara J. Hurst, Asst. Public Defender, for defendant.

## OPINION

WEISBERGER, Justice.

This case comes before us on the defendant's appeal from a judgment of conviction for robbery entered in the Superior Court. The defendant challenges the identification procedures used in the case, certain rulings of the trial justice relating to the admissibility of evidence, the denial of his motion for new trial, and the constitutionality of the grand jury on the ground of exemption of the cognizable class of academics. We affirm. The facts of the case as disclosed by the record are as follows.

On February 2, 1980, Joan H. Farland was engaged in operating a mail truck as an employee of the United States Postal Service. She was accosted by a white male wearing a toque hat and a jacket. The man placed something against her back, which she apparently believed was a firearm, and ordered her into the back of the mail truck. As she entered the mail truck, she threw the vehicle's keys away. She lay down in the truck, and her hands were taped by the first assailant whom she had observed for a period of four or five seconds and later described as being slim in build, thin through the face, and to be about five foot seven inches in height. A second man then approached whom she described as being five foot seven or eight inches tall and of medium build with dark brown hair. The second man demanded to know where the keys were. She told him that she had thrown the keys away but the second man found the keys and drove the truck from the scene.

The truck was driven to Noto Drive in the town of North Providence. Ms. Farland was told to remain in the back, but when she heard a woman's voice followed by silence, she ran away and called the police. Ms. Farland was unable to make an identification of defendant at trial, but she did say that he resembled the driver. Further, Ms. Farland had made another identification of someone else prior to the trial and had stated at that time to the police that she was 90 percent positive that the man identified was the "first man." She appeared uncertain about the identities of the "first" and "second" man.

Cynthia A. Ostalkiewicz (Cynthia) and her husband, Clarence, resided at 1 Noto Drive, North Providence. They operated a jewelry showroom at their home and did business solely by appointment. On Saturday, February 2, 1980, Cynthia and Clarence were working in their showroom at about 12:40 p.m. when a mail truck arrived in front of their home. Cynthia went to the front door of the family room and observed through the window both the mail truck and a man standing outside the door holding a package. She called to her husband that the mail truck had arrived and opened the door, which generally was kept locked. As she opened the door, the man stated that he had a package for her and had trouble pronouncing her last name. The man then pushed his way in, carrying the package, and as he did so, he fumbled with a mask and pulled it down over his face. Cynthia collapsed "from fear of what happened." Cynthia's opportunity to observe the man was limited to the time that she saw him through the window; the time during which he addressed her at the open door, repeating her name and stating that he had a package for her; and the time during which he fumbled to place the mask over his face. Cynthia estimated this time as a matter of seconds. She described the man as being in his mid to late twenties, about five foot seven or five foot eight inches tall, of medium build, and wearing a tan coat.

The intruder pulled a gun from his left side and commanded Cynthia, as well as a customer who had gone from the showroom into the family room, to lie on the floor. The intruder admitted a male accomplice and ordered Cynthia and the customer into

the showroom. The two robbers then proceeded to gather and take away more than $250,000 worth of jewelry. At some point during this process the robbers tied Cynthia with white masking tape.

Clarence was in the showroom at the time the first robber pushed his way into the house. He was alerted by noises coming from the family room. He observed an individual wearing a mask and immediately activated the burglar alarm. Clarence then went into a back room, closed the door, and awaited the arrival of the police. However, the alarm was not working, and the police did not arrive until after the intruders had left.

Thereafter, Raul M. Vargas, Jr. (Vargas), a United States postal inspector, investigated the robbery because it had involved the abduction of a postal-service employee. He showed Cynthia photographs on a number of occasions seeking an identification of the intruder. On March 7, 1980, Vargas showed Cynthia eight photographs from which she identified defendant, Paul Courteau. The same eight photographs were shown to Cynthia on May 12, 1980, at the North Providence police station. She again selected defendant from the photographic array as the person who forced his way into her house on February 2, 1980.

On September 15, 1980, Cynthia went to the courthouse in Brockton, Massachusetts with Vargas and Detective George Bergeron of the North Providence police department in order to view a lineup. As they were standing in the hallway waiting for the lineup to be assembled, Cynthia suddenly stopped talking and appeared faint. She testified that she saw defendant coming through the courtroom door and recognized him as the individual who had intruded into her home on February 2.

The issues raised by defendant on appeal will be considered in the order in which they are set forth in defendant's brief. Additional facts will be supplied as necessary in respect to each issue.

## I

## THE CHALLENGE TO THE PHOTOGRAPHIC DISPLAY ON THE GROUND OF IMPERMISSIBLE SUGGESTIVITY

■ Essentially, defendant's challenge to the identification drawn from the photographic display is based upon a statement made by Vargas. As Vargas showed Cynthia the eight photographs, he recalled saying that "I had an informant, and that there was a possibility of the photos that I was going to show her that day, there is a possibility that the photograph of the person who did the robbery might be in there (sic) * * *." The defendant claims that this comment was so unnecessarily suggestive as to amount to a violation of due process. In rejecting this challenge, the trial justice made the following findings:

"There was no suggestion made to her as to anything. Naturally, we would expect that the photograph of a suspect would be included in it. Otherwise it would be a waste of time for everybody. The fact is that it was a very good job of presenting photographs of people who had certain similar features. They were all young white males. Some wore a mustache. Most of them were clean shaven. I know that as I looked at the exhibits after they were made full exhibits I was impressed by the similarity of some of the photographs."

"Was this demonstration of photos violative of due process? Definitely not. There was no suggestion made by either Inspector Vargas or Sergeant Bergeron of the North Providence police department. It seems to me the display was completely fair and not at all suggestive."

The seminal expression of principle relating to the constitutional limitation upon the use of photographs as an identification device in criminal cases is found in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In that case Justice Harlan, speaking for a majority of the Court, made the following observations con-

cerning the use of photographs to identify criminal suspects:

"We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.

This standard has been cited with approval by the Court in later cases when the issue of suggestiveness of a confrontation for identification has been raised. *E.g., Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (exhibiting a single photograph); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (one person show-up).

The defendant argues that *Manson v. Brathwaite* is controlling in this case. It must be noted that in *Manson* a two-step analysis was used. First, the question of whether the exhibition of a photograph to undercover officer Glover was unnecessarily suggestive was resolved. After determining that the display of one photograph was unnecessarily suggestive, the Court took the second step in its analysis and held "that reliability is the linchpin in determining the admissibility of identification testimony for both pre and post *Stovall* confrontations." *Id.* 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154.[1] It is significant to note that in *Manson v. Brathwaite, supra,* the State of Connecticut admitted that the procedure of showing a single photograph was unnecessarily suggestive. Thus, the first point was not really in issue. The defendant in his argument spends considerable effort on the second step in the analysis.

In the case at bar, however, we are of the opinion that the evidence in the case overwhelmingly supports the trial justice's finding that the photographic display was not suggestive at all. In challenging this finding by the trial justice, defendant cites *State v. Doughty*, 408 A.2d 683 (Me.1979). In that case the victim of a robbery was shown a photographic display and picked out one of the photographs as that of his assailant. Upon his doing so, the detective confirmed that a correct identification had been made. The trial judge made no findings of fact or conclusion of law concerning the suggestiveness of this identification. The Supreme Judicial Court, exercising its independent judgment, found that the procedure used by the Bangor police was unnecessarily suggestive and conducive to irreparably mistaken identification. Nevertheless, taking the second step of the analysis, as suggested in *Neil v. Biggers, supra,* the Court found that the use of the in-court identification was reliable and, therefore, consistent with constitutional requirements.

Unlike the Supreme Judicial Court of Maine, it is unnecessary for us to reach the second step in the analysis because we sustain the trial justice's finding that the photographic display was not suggestive at all. Vargas's statement that there was a "possibility" that a suspect might be included in the photographic display was, as the trial justice found, only a statement of the obvious. Whether explicit or implicit, it will probably be inferred by a victim in any case that a photographic display presented may possibly include one suspected of a crime. Unlike the Bangor detective, Vargas made no definite statement indicating his independent belief that any person set forth in the display was guilty of the crime. Thus, it could scarcely be said that this identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

---

1. *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). This case established a totality-of-circumstance due-process test for confrontations for identification preceding

*United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

*Simmons v. United States,* 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253.

## II

### THE CHALLENGE TO THE TRIAL JUSTICE'S DENIAL OF DEFENDANT'S MOTION FOR NEW TRIAL

■ The defendant, in support of this issue argues that the in-court identification of defendant by Cynthia was not sufficiently reliable to permit a rational trier of fact to be convinced of the defendant's guilt beyond a reasonable doubt. After the jury had rendered its verdict, the trial justice heard a motion for new trial and made the following comments after an extensive review of the evidence that had been presented at trial:

"The State presented a very strong case, and all of the witnesses stood up well under cross-examination. The State proved its case by ample evidence with proof beyond a reasonable doubt. There is no question about the credibility of the State's witnesses. I know that if I had been hearing the case without a jury, I would have definitely found the defendant guilty as charged."

In passing upon the decision of a trial justice on a motion for new trial, our standard of review is well settled. In order to set aside the decision of the trial justice denying such a motion, defendant must persuade this court that the trial justice misconceived or overlooked material evidence on a critical issue or that he was otherwise clearly wrong. *State v. Roddy,* R.I., 401 A.2d 23 (1979); *State v. DaRocha,* 121 R.I. 182, 397 A.2d 500 (1979); *State v. Murphy,* 113 R.I. 565, 323 A.2d 561 (1974).

■ In the case at bar Cynthia's eyewitness testimony, corroborated to some extent by the testimony of Ms. Farland, supports the decision of the trial justice. The arguments of defendant concerning the defects in the testimony of these witnesses were appropriately made to the jury and the trial justice. Considering these arguments in the context of the totality of the record, we do not believe that defendant has sustained the burden of showing that the trial justice overlooked or misconceived the evidence on a critical issue or was otherwise clearly wrong.

## III

### THE CHALLENGE TO THE TRIAL JUSTICE'S RULING PRECLUDING INQUIRY CONCERNING THE PENDING CIVIL SUIT BROUGHT BY THE VICTIM AGAINST THE GUARDIAN ALARM COMPANY

In cross-examining Cynthia, defense counsel attempted to question her concerning a civil action that she had brought against the Guardian Alarm Company for the alleged failure of the alarm system installed in her home. The trial justice determined that this inquiry was "completely irrelevant" and sustained the state's objection to cross-examination on this issue.

■ As we stated recently in *State v. Barnville,* R.I., 445 A.2d 298, 301–02 (1982):

"Generally relevant evidence has been defined as evidence that has a tendency to prove or disprove a fact provable in the case. *State v. Santos,* R.I., 413 A.2d 58, 69 (1980); *McCormick's Handbook of the Law of Evidence* § 185 at 435 (2d ed. Cleary 1972); *see* 1 Wigmore, *Evidence* §§ 12, 25–29(a) (3d ed. 1940); James, *Relevancy, Probability and the Law,* 29 Cal. L.Rev. 689 (1941); *see also* Fed.R.Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

"Although the foregoing principles are not difficult to state, in particular cases such principles are often not easily applied. This is particularly true in respect to the admission or exclusion of circumstantial evidence. It is for this reason that we have frequently stated that questions of relevancy are addressed to the sound discretion of the trial justice. *State v. Camerlin,* 116 R.I. 726, 729, 360 A.2d 862, 865 (1976); *State v. Verdone,* 114 R.I. 613, 617, 337 A.2d 804, 808 (1975);

*State v. Mastracchio,* 112 R.I. 487, 491, 312 A.2d 190, 193 (1973); *State v. Duffy,* 112 R.I. 276, 286, 308 A.2d 796, 802 (1973), overruled on other grounds, *State v. McGehearty,* R.I., 394 A.2d 1348, 1351 (1978). Thus, we review only for an abuse of such discretion."

In *State v. DeBarros,* R.I., 441 A.2d 549 (1982), we held that preclusion of cross-examination regarding a civil suit brought against the state by the complaining witness was relevant to the issue of the witness's possible bias in giving his testimony at trial. Although *DeBarros* may bear a superficial resemblance to the case at bar, such resemblance disappears upon closer scrutiny. In the case at bar, no one disputed that a robbery had taken place. The only issue in the case was whether defendant was a participant in the robbery. The functioning or nonfunctioning of the alarm system had no bearing upon this issue. Neither did the existence of the civil action have a bearing upon the bias of the witness. In this case the conviction or acquittal of defendant would neither enhance nor detract from the liability of the alarm company for the failure of its equipment to function. Thus, we are of the opinion that the analysis in *State v. Barnville, supra,* is applicable. Applying that analysis to the exclusion of testimony concerning the action against Guardian Alarm Company, we believe that defendant has demonstrated no abuse of discretion and no substantial injury resulting from such exclusion. The action against the alarm company would neither be supported nor weakened by a finding that defendant either was or was not found to be a participant in the crime.

## IV

## THE CHALLENGE TO THE CONSTITUTIONAL VALIDITY OF THE GRAND JURY BY REASON OF EXEMPTIONS GRANTED TO STUDENTS AND PROFESSORS AT COLLEGES AND UNIVERSITIES WITHIN THE STATE

Prior to trial defendant moved to dismiss the indictment that had been brought against him on the ground of a challenge to the constitutionality of the composition of the grand jury. He argued that the exemption provided to students and professors at colleges and universities in this state violated his due-process right to a grand jury drawn from a representative cross section of the community.

In support of this contention, evidence was introduced which had been elicited in another criminal case, *State v. Brown,* C.A. No. P2/80–174, which had been heard before the same trial justice. In that case an investigator for the Public Defender's office testified that he had examined the academic exemptions exercised during the 1979–80 period and determined that four persons had exercised such exemptions. More significantly, these individuals were all who would have been eligible for that exemption during the relevant period. We are thus confronted with the question of whether an exemption accorded to members of a cognizable class may render the composition of a grand jury constitutionally infirm by reason of a failure to comply with the fair cross-section requirement laid down by the Supreme Court of the United States in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), and applied by this court in *State v. Jenison,* R.I., 405 A.2d 3 (1979). In *Taylor* the Supreme Court of the United States held that a jury-selection system that provided that a woman should not be selected for jury service unless she had previously filed a written declaration of her desire to be subject to jury service was constitutionally invalid because of its failure to meet the fair-cross-section requirement. In that case the selection scheme resulted in juries which consisted of approximately 10 percent women, even though 53 percent of the persons eligible for jury services in the parishes under consideration were female. In commenting upon the effect of this decision, Mr. Justice White observed:

"The States are free to grant exemptions from jury service to individuals in case of special hardship or incapacity and

1364

to those engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare. * * * It would not appear that such exemptions would pose substantial threats that the remaining pool of jurors would not be representative of the community. A system excluding all women, however, is a wholly different matter. It is untenable to suggest these days that it would be a special hardship for each and every woman to perform jury service or that society cannot spare *any* women from their present duties." *Taylor v. Louisiana,* 419 U.S. at 534–35, 95 S.Ct. at 700, 42 L.Ed.2d at 700–01.

In the later case of *Duren v. Missouri, supra,* the Court also invalidated a jury-selection system that provided an automatic exemption from jury service for any woman requesting not to serve. This system resulted in jury venires that were on average less than 15 percent female, although 54 percent of the adult inhabitants of the relevant county were women. In holding this opt-out system as invalid as the opt-in mechanism of *Taylor,* the Supreme Court through Mr. Justice White still maintained that a state had the right to provide reasonable exemptions in furtherance of a significant state interest. The Court also recognized that "most occupational and other reasonable exemptions may inevitably involve some degree of overinclusiveness or underinclusiveness * * *." *Duren v. Missouri,* 439 U.S. at 370, 99 S.Ct. at 671, 58 L.Ed.2d at 590.

This court in *Jenison, supra,* similarly recognized that members of a cognizable class, such as academics, might be exempted (as opposed to being excluded) from jury service. In commenting upon the lack of state interest in the total and arbitrary exclusion of academics from jury service, this court noted:

"Moreover, the appropriate way to avoid interfering with the scholarly pursuits of professor and student alike is by exempt-

ing, not excluding, them from service in appropriate cases. The total and arbitrary exclusion of the university and college academic community from the grand-jury selection process is an impermissible violation of the due-process right of the criminal defendant to be indicted by an impartial grand jury drawn from a fair cross-section of the community." 405 A.2d at 10.[2]

During the period applicable to this case, G.L.1956 (1969 Reenactment) § 9–9–3, as amended by P.L.1974, ch. 116, § 1 provided exemption not only for professors, tutors, and students of recognized universities and colleges but also, inter alia, for justices of the state and United States courts, clerks of courts, practicing attorneys-at-law, sheriffs, deputy sheriffs, marshals, deputy marshals, members of any paid police force of the state or of any city or town, members of any paid fire department of any city or town, priests, ministers, rabbis, and others holding ecclesiastical office in religious organizations, as well as members of Congress from the State of Rhode Island, the general officers of the state and the members and officers of the General Assembly during their tenure of office irrespective of whether the General Assembly is in session or not. Thus, the Rhode Island statute exempted many persons whose uninterrupted performance of their respective occupations was deemed important to the community's welfare. The court in *Jenison* did not condemn such exemptions but did condemn the entire exclusion of "an identifiable and cognizable class playing a major role in the community, without a rational reason therefor * * *." 405 A.2d at 8.

As the Supreme Court of the United States suggested in *Taylor v. Louisiana:*

"[W]e impose no requirement that petit juries actually chosen must mirror the community and reflect the various dis-

**2.** In *State v. Jenison,* R.I., 405 A.2d 3 (1979), it was undisputed that although the statute provided only for exemption of "the president, professors, tutors, and students of recognized universities and colleges," G.L.1956 (1969 Reenactment) § 9–9–3, the jury commissioner had improperly applied this exemption as a total exclusion.

tinctive groups in the population. Defendants are not entitled to a jury of any particular composition [citations omitted] but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." 419 U.S. at 538, 95 S.Ct. at 702, 42 L.Ed.2d at 703.

In confronting a similar scheme of exemption for members of certain occupations for federal juries in the Commonwealth of Massachusetts, Chief Judge Wyzansky observed:

> "The Plan is not unconstitutional on the ground that it provides that certain professional classes shall be excused from jury duty. The excuses reflect a rational accommodation between the community's need for jurors and its need for uninterrupted religious, medical, teaching and like services. If persons of professional background be regarded as a cognizable group, that group is adequately represented by persons from disciplines which are not made a basis for excuse from jury duty. In any event, the discrimination is not 'purposeful', in the sense that it is designed to preclude a fair cross-section." *United States v. Arnett,* 342 F.Supp. 1255, 1261 (D.Mass.1970).[3]

Although the Legislature has since repealed the exemption previously granted to academics,[4] such exemptions are still accorded to a large number of members of occupations and professions whose uninterrupted performance is considered to be of significant interest to the state. We do not believe that the exemption granted to professors and students at colleges or the other exemptions granted to members of specific occupations violate the cross-section requirements set forth in *Taylor, Duren,* or *Jenison.* The state, in providing exemp-

tions for members of professions and occupations in which it has a significant interest will always be somewhat under—or overinclusive. No grand jury or petit jury will ever completely mirror the community. We are of the opinion that the exemptions provided from jury service by the Rhode Island Legislature at the time relevant to this indictment were reasonable and did not violate the cross-section requirements imposed by the Sixth Amendment to the Constitution of the United States.

For the reasons stated, the appeal of the defendant is denied and dismissed, the judgment of conviction is affirmed, and the papers in the case may be remanded to the Superior Court.

---

**3.** Among those exempted or excused upon request from jury duty in the District of Massachusetts were (1) ministers of religion; (2) registered physicians, surgeons, dentists, pharmacists and nurses; (3) teachers at a university, college, academy, or other school having a regular schedule of classes; (4) attorneys at law;

(5) sole proprietors of businesses; and (6) persons residing a certain distance from the place of holding court to whom no private or public transportation was available.

**4.** P.L.1980, ch. 242, § 2.