STATE

v.

William CONWAY.

No. 81–427–C.A.

Supreme Court of Rhode Island.

July 29, 1983.

Reargument Denied Sept. 28, 1983.

tion, thus the concern of the Providence city solicitor with Blue Ribbon's lease extension.

Dennis J. Roberts II, Atty. Gen., Sharon O'Keefe, Sp. Asst. Atty. Gen., Chief, Appellate Div., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Atty., Providence, for defendant.

## OPINION

MURRAY, Justice.

This is the defendant's appeal from a judgment of conviction for second-degree murder entered in the Superior Court. The defendant raises the following issues on appeal: (1) that the trial justice erred when he failed to instruct the jury on voluntary manslaughter, (2) that the trial justice erred in overruling defendant's objections to certain portions of the prosecutor's closing argument, (3) that the trial justice erred in permitting a witness to testify regarding statements made by the victim a month prior to her death, (4) that the trial justice erred in admitting certain tangible evidence, (5) that the indictment against the defendant should have been dismissed because of the unconstitutional composition of the grand- and petit-jury panels, and (6) that the trial justice erred in instructing the jury on the definition of "reasonable

doubt." For the reasons that follow, we affirm the conviction below. The facts of the case as disclosed by the record are as follows.

The defendant, William Conway (Billy), and Debra Deignan (Debbie) lived together, with their two-year-old son Christopher, in an apartment at 85 Hamilton Street in Providence. On Friday morning, January 4, 1980, the two were visited by a co-worker of Billy's, Harry Baker, who brought wine and beer. The three drank together for most of the day. Harry testified that while he was present Debbie was wearing only a bathrobe that was open, exposing her naked body. Sometime later, Debbie took the robe off completely and continued to walk around naked. At approximately 3 p.m., Ethel Manchester dropped off her daughter, expecting Debbie to babysit. At this point, Billy was in the bedroom watching television. Harry stated that he put Debbie in the bathroom when Mrs. Manchester came by because he didn't want anyone to see her drunk and naked. Harry left the apartment at approximately 4 p.m. that afternoon.

In statements to police, Billy indicated that just after Harry left, he found Debbie lying naked on the bathroom floor. He stated that he hit her then, causing a black eye and bloody bruises around the nose. He also told police that Debbie was alive on Saturday morning, January 5, and that he last saw her at approximately 1:30 or 2 p.m., before he went to sleep.

At approximately 8:30 p.m. on January 5, Ronald DeCosta, a friend of Billy's, stopped by to visit Billy and Debbie. Billy answered the door sleepily, and told Ron that Harry and Debbie had had sexual relations. Ron, demanding to see Debbie, went into the bedroom to find her. He discovered her bruised and cold body and told Billy that she was dead. He then left to call the rescue squad and the police. Billy, upset and nervous, took his son Christopher to Billy's mother's house down the block.

When Billy returned to his own apartment, the police had already arrived. Two detectives took him to the Providence police station where he was interrogated, then booked and fingerprinted. Photographs were taken of his swollen and lacerated hand. The two detectives testified that Billy told them he had beaten Debbie with a belt and that at one point he muttered, "I didn't mean to kill her."

On February 8, 1980, defendant was charged by indictment with the murder of Debra Deignan. On November 24–26, 1980, and December 1–4, 1980, the trial justice heard pretrial motions, including defendant's motion to dismiss the indictment and motion to suppress. Both motions were denied. After a nine-day trial in January 1981, a Superior Court jury found defendant guilty of second-degree murder. The trial justice denied defendant's motion for a new trial, and he was sentenced to serve thirty-five years, five of which were suspended.

We shall consider the issues raised by defendant on appeal in the order in which they are set forth in his brief. Additional facts will be discussed as necessary with respect to each issue raised.

I

The defendant first contends that the trial justice erred in refusing to instruct the jury on voluntary manslaughter as defendant requested. The trial justice instructed the jury on three different forms of criminal homicide: first- and second- degree murder and manslaughter.

The trial justice defined manslaughter in the following manner:

"Now, the third crime I told you was included in the general charge of murder is manslaughter. Manslaughter is the unlawful killing of a human being without malice, express or implied, or premeditation.

"If you find that the State proved that the defendant did, without premeditation or malice, deliver the fatal blow or blows resulting in death, then the verdict would be one of guilty of manslaughter.

"Again, manslaughter is the unlawful, but unintentional killing of a human being without malice aforethought or premeditation, for which the law places responsibility on the defendant because he is guilty of an unlawful act or omission of a nature which is not so wrong as to make the defendant liable for murder, nor so harmless as to make him not responsible at all.

"It is well-settled in the case of homicide, ladies and gentlemen, that one who wantonly or recklessly does an act that results in the death of a human being is guilty of manslaughter, although he did not contemplate such a result. Nothing more is required than the intentional doing of an act which, by reason of its wanton or reckless character, exposes another person to injury, and causes such an injury."

The defendant asserts that the trial justice was required to instruct the jury with regard to all lesser included offenses that were warranted by the evidence. He maintains that the evidence before the jury in the instant case warranted an instruction on voluntary manslaughter.

■ We do not disagree that a defendant is entitled to an instruction on a lesser included offense, if the evidence supports it. *Beck v. Alabama,* 447 U.S. 625, 635–36, 100 S.Ct. 2382, 2388–89, 65 L.Ed.2d 392, 401–02 (1980). A trial justice's instructions should reasonably set forth all of the salient and essential propositions of law that relate to material issues of fact which the evidence tends to support. *State v. Manning,* R.I., 447 A.2d 393, 394 (1982). In a homicide prosecution, the court must instruct the jury on any lesser included offense which is warranted by the evidence. *State v. Goff,* 107 R.I. 331, 335–36, 267 A.2d 686, 688 (1970). However, as we reiterated most recently in *State v. Botelho,* R.I., 459 A.2d 947, 950 (1983), "The jury's attention should not be directed to various propositions of law unless the record contains evidence which supports and requires it." *State v. Infantolino,* 116 R.I. 303, 307, 355 A.2d 722,

724–25 (1976). A trial justice is not required to construct a strawman or to create a specter or a ghost. Jury instructions must be premised upon the evidence adduced at trial. In the case before us we find that there is simply no evidence to warrant an instruction on voluntary manslaughter.

We consistently have followed the common-law definition of manslaughter in this jurisdiction. *State v. Fenik,* 45 R.I. 309, 121 A. 218 (1923). Voluntary manslaughter is defined as "an intentional homicide without malice aforethought in the heat of passion as a result of adequate provocation." *State v. Lillibridge,* R.I., 454 A.2d 237, 240 (1982); *State v. Vargas,* R.I., 420 A.2d 809, 815 (1980). Thus, to sustain an instruction on voluntary manslaughter, there must be some evidence to indicate that the killing occurred while the defendant was still in the heat of a sudden rage precipitated by a legally adequate cause.

In the instant case there is no evidence of a legally adequate cause. The defendant asserts that his discovery of his "wife" naked on the bathroom floor immediately after a male visitor had left her there would be legally adequate provocation. However, there is no evidence, other than defendant's bare assertions, that anything had occurred between Harry and Debbie in the bathroom that afternoon. Harry denied that he had had sexual relations with Debbie and maintained that he had simply placed her in the bathroom to prevent her from being seen by a visitor in her naked and drunken state. The visitor, Ethel Manchester, reported that she had, in fact, seen Harry and Billy when she came by the apartment, but had not seen Debbie. The defendant also admitted that Debbie had denied having sexual relations with Harry that day. And there was no testimony that defendant had actually discovered Debbie and Harry engaged in sexual relations.

Furthermore, there is no evidence that this killing occurred while defendant was in the heat of passion without time to cool off. The evidence, in fact, compels the opposite

conclusion. Expert medical testimony placed the probable time of death at between 10:40 a.m. and 2:40 p.m. on Saturday, January 5. Doctor Arthur Burns, Deputy Chief Medical Examiner, concluded that Debbie died within five to ten minutes of sustaining a trauma to her neck which caused a fracture of the hyoid bone, resulting in asphyxia. Dr. Burns did acknowledge a slight possibility that Debbie could have died as a result of a slow compromise of the airway. He testified that under those circumstances a victim could survive, at most, from twelve to eighteen hours after the trauma had occurred.

Thus, even under this theory, if defendant had inflicted an injury that ultimately caused Debbie's death after he discovered her naked in the bathroom sometime in the late afternoon on Friday, Debbie would have been dead by noon on Saturday. However, Billy's statement to police and the testimony of his mother, Mary, both indicated that Debbie was still alive at approximately 2 p.m. on Saturday. It is clear that Debbie's death did not occur in the heat of passion precipitated by a legally adequate provocation. The trial justice therefore did not err in refusing to instruct the jury on voluntary manslaughter. The evidence in this case simply would not support such a finding. *See State v. Cline*, R.I., 405 A.2d 1192, 1204 (1979); *State v. Infantolino*, 116 R.I. at 307–08, 355 A.2d at 725.

## II

The second issue raised by defendant is that the trial justice erred in overruling defense counsel's objections to certain portions of the prosecutor's closing argument. The defendant objected three times to the prosecutor's characterizations of Debbie as a victim of habitual battering.[1]

The prosecutor stated:

"William Conway beat Debbie Deignan with regularity. It became a way of life,

for him as well as for her. * * * Mr. Conway had beaten her so successfully in the past, he might just as well have said, 'Why did she die this time? She had the audacity to die on me this time. She never died before.' Those bruises are brutal.

"If there is anything that was gradual in this case, if there is anything which was a slow compromise, it was the future and the existence of Debbie Deignan, because she was battered and she was abused and she took it one time too many."

The defendant contends that these remarks were inflammatory and prejudicial and were not based upon the evidence and the reasonable inferences that could be drawn therefrom. However, we find that there was some factual basis in the evidence for these assertions and that the prosecutor did not overstep his bounds in arguing the existence of a pattern of spouse abuse in this case.

It is clear from the testimony and the photographs offered into evidence by the state that Debbie was severely beaten prior to her death. The medical examiner, Dr. Arthur Burns, testified that the bruises on Debbie's body were of varying ages. The doctor also stated that, in his opinion, the bruises were connected with the cause of death because they represented a pattern of behavior he called a "syndrome" of spouse abuse.

Moreover, other witnesses testified regarding physical manifestations of beatings or occurrences from which the inference of violence could be drawn. Ethel Manchester testified that approximately one month before Debbie's death she had seen scratches on her face and dried blood on her nose. She also described a bloody scratch she saw above Debbie's nose on Friday evening, January 4, 1980. Cathy McClellan testified that around Christmas she had witnessed an argument between Debbie and Billy during

---

1. The trial justice sustained one of defendant's objections to the prosecutor's remarks. That statement therefore is not in issue.

which Billy had slapped Debbie. Cathy also noted Debbie's bruised and bloody nose on January 4. Steven Manchester stated that on January 3 he overheard Billy on the telephone threatening to beat Debbie if she didn't return home immediately. A neighbor who lived above Debbie and Billy testified to hearing frequently the loud voice of defendant and pounding sounds coming from the apartment below on Saturday and Sunday nights. He also recalled hearing similar noises on the Saturday in question. Finally, defendant himself admitted to hitting and slapping Debbie on occasion.

■ It is well settled that a prosecutor is allowed considerable latitude in arguing the state's case as long as he stays within the evidence and the legitimate inferences that may be drawn therefrom. *State v. Parente,* R.I., 460 A.2d 430, 439 (1983); *State v. Scott,* 114 R.I. 132, 137, 330 A.2d 66, 70 (1974); *State v. Mancini,* 108 R.I. 261, 274 A.2d 742 (1971). A prosecutor may even express his opinion or belief regarding a defendant's guilt or the veracity of a witness's testimony as long as it is based on the evidence and does not permit the jury to infer that it stems from reasons or knowledge outside the record. *State v. Kozukonis,* 100 R.I. 298, 304, 214 A.2d 893, 897 (1965). *See State v. Plante,* 111 R.I. 386, 302 A.2d 804 (1973).

■ A determination of whether a challenged remark is prejudicial cannot be decided by a fixed rule of law. *State v. Collazo,* R.I., 446 A.2d 1006, 1010 (1982). The trial justice must evaluate the probable effect of the remark on the outcome of the case by examining it in its factual context. *State v. Parente,* R.I., 460 A.2d at 439; *State v. Collazo,* R.I., 446 A.2d at 1010. If the challenged comments are totally unsupported by the evidence and tend to inflame the passions of the jury against the defendant, then prejudice clearly inheres. *State v. Parente,* R.I., 460 A.2d at 439; *State v. Collazo,* R.I., 446 A.2d at 1010; *State v. Mancini,* 108 R.I. at 273–74, 274 A.2d at 748.

■ As we discussed above, the prosecutor's argument that Debbie's death was caused by a pattern of battering and abuse had an adequate factual basis in the evidence and in the inferences that the jury itself could have drawn. *See State v. Plante,* 111 R.I. 386, 391, 302 A.2d 804, 807 (1973). Furthermore, the trial justice cautioned the jury that arguments and statements by counsel were not evidence to be considered. We do not believe therefore that the prosecutor's remarks prejudiced defendant. Accordingly, the trial justice did not err in overruling defendant's objections thereto.

### III

The defendant next contends that the trial justice erred in permitting Ethel Manchester to testify regarding a statement made by Debbie approximately one month before her death. Ethel testified that she had seen Debbie at that time and had noticed that she had scratches on her face and a bloody nose. Ethel stated that Debbie had told her then that she and Billy had had an argument and that Billy had beaten her up.

Defense counsel objected to this testimony and moved to strike it, and then moved to pass the case. The trial justice denied both requests. The defendant argues here that this statement was "rank hearsay," inadmissible under any exception to the hearsay rule. He claims that its admission seriously prejudiced him and deprived him of his right to confront and cross-examine witnesses and, thus, of his right to a fair trial.

■ We agree with defendant that this testimony was hearsay, "an out-of-court statement offered to prove the truth of the matter asserted in that statement," *State v. Poulin,* R.I., 415 A.2d 1307, 1309 (1980). Moreover, we agree that it falls within no recognized exception to the hearsay rule. However, the error of admitting hearsay evidence does not automatically require reversal if there is no prejudice to the defendant. *State v. Fortier,* R.I., 427 A.2d 1317,

1325 (1981); *State v. Poulin,* R.I., 415 A.2d at 1311. It is well settled that the admission of hearsay evidence is not prejudicial when the evidence is merely cumulative and when the defendant's guilt is sufficiently established by other competent evidence. *State v. Fortier,* R.I., 427 A.2d at 1325; *State v. Angell,* R.I., 405 A.2d 10, 14 (1979); *State v. Camerlin,* 117 R.I. 61, 65, 362 A.2d 759, 761 (1976).

As we noted earlier, Ethel Manchester's testimony was not the only evidence that tended to establish that defendant had engaged in a continuous pattern of beating Debbie Deignan. The medical testimony supports this theory, as does the testimony of Cathy McClellan, who saw Billy slap Debbie; Steven Manchester, who heard Billy threaten Debbie with a beating; and those same witnesses who had seen Debbie's scarred face and bloody nose on Friday, January 4. Billy's admissions to police that he had slapped Debbie and beaten her with a belt also support this theory.

Furthermore, there was ample evidence in the record to support the jury's finding defendant guilty of second-degree murder. This evidence included Billy's admission to police that he didn't mean to kill Debbie, the photograph of his swollen and lacerated hand, and the medical testimony and photographs that illustrated the manner and cause of death.

█ Consequently, since there was other probative evidence on the same issue to which the erroneously admitted evidence related and since there was other admissible evidence upon which the jury could base its finding of guilt, the admission of Ethel Manchester's testimony was at most harmless error.

## IV

The defendant's fourth claim of error concerns the admission of a bat, a belt, and a belt buckle into evidence over defendant's objection.

When the police entered Billy's apartment and discovered Debbie's battered body, they seized all instrumentalities within the immediate vicinity that could possibly have been used in the beating. Among these were a small bat, a hammer, a belt, and a belt buckle. The police Bureau of Criminal Identification (BCI) found no fingerprints on any of the items.

The BCI sent the hammer and belt buckle to the State Crime Laboratory at the University of Rhode Island, where they were examined and tested by Dr. David DiFanti. Doctor DiFanti found no evidence of blood, skin, or hair fibers on these items. The bat was never sent for analysis. Notwithstanding the lack of scientific evidence connecting these items to the crime, the trial justice admitted the bat, belt, and buckle into evidence at trial. The hammer was not admitted.

The defendant contends that these items of evidence were irrelevant and that the state had failed to establish any nexus between these items and Debbie's death. He further maintains that the introduction of the belt, buckle, and bat was erroneous and prejudicial and merely served to arouse the jury's emotions against him.

█ As we have so often stated, and recently reiterated in *State v. Calitri,* R.I., 459 A.2d 478, 480 (1983) and *State v. Parente,* R.I., 460 A.2d 430, 436 (1983), the determination of whether evidence is relevant is within the sound discretion of the trial justice. The trial justice's ruling will not constitute reversible error unless it is a prejudicial abuse of discretion. *State v. Parente,* R.I., 460 A.2d at 436; *State v. Pemental,* R.I., 434 A.2d 932, 937 (1981); *State v. Gelinas,* R.I., 417 A.2d 1381, 1386 (1980). Generally, evidence is admissible provided that it is competent evidence that reasonably tends to prove a material fact in issue and is not offered for the purpose of arousing the passions of the jury. *State v. Parente,* R.I., 460 A.2d at 436–37; *State v. Gelinas,* R.I., 417 A.2d at 1386–87.

█ We cannot agree with defendant that the state failed to establish the relevancy of the bat, belt, and buckle or to

connect them with the crime. The medical testimony suggests that the bat could have been used to make some of the bruises on Debbie's body. Doctor Burns stated that he believed some of the bruises were caused by a "cylindrical object" and some could have been caused by a round object or some other blunt instrument such as a foot or a fist. The defendant himself established a link between the belt and the beating. In his statement to police he described the belt and confessed that he had hit Debbie five or six times with it. In addition, Detective William Dwyer testified that the buckle matched the belt and that he had taken it because marks on Debbie's back suggested that she had been beaten with it.

Furthermore, the medical testimony established a direct relationship between the beating Debbie received and her death. Doctor Burns testified that the actual cause of death was asphyxia due to strangulation. He described the mechanism of death as the inhibition of the vagus nerve caused by a fracture of the hyoid bone, which inhibition, in turn, caused a slowdown of the heart or an arrythmia that ultimately resulted in death. The doctor noted a bruise on the neck which coincided with the location of the fractured hyoid bone. He also testified that a person under a great deal of stress, such as that caused by a beating, would be very prone to a fatal arrythmia. He expressed his opinion that Debbie was the victim of the syndrome of spouse abuse.

There was no question from the other evidence in this case that Debbie was beaten prior to her death. The state presented medical evidence to link the beating with the cause and mechanism of death. The introduction into evidence of instruments that were possibly or probably used in the beating was relevant, probative, and admissible. See State v. Earley, 118 R.I. 205, 211, 373 A.2d 162, 165 (1977); State v. Kieon, 93 R.I. 290, 293, 175 A.2d 284, 286 (1961). This is particularly true of the belt, which fur-

nished a link in the chain of circumstances tying defendant to the crime. See State v. Bowden, 113 R.I. 649, 658–59, 324 A.2d 631, 638 (1974).

Moreover, we do not believe that these items had a tendency to inflame the jury. See State v. Opeilewski, 115 R.I. 111, 116, 341 A.2d 722, 725 (1975) (admission of blood-stained pants had no tendency to arouse passions of jury). Therefore, the trial justice did not abuse his discretion in admitting these items into evidence.

V

The defendant next contends that the trial justice erred when he denied defendant's motion to dismiss the indictment. In his pretrial motion, defendant challenged the composition of the grand-jury and petit-jury panels, alleging that the exemption provided to college professors and students violated his Sixth Amendment right to a jury representing a fair cross section of the community.

Jury Commissioner Alfred Travers, Jr., testified at the hearing held on defendant's motion. He described his method of administering the "academic exemption" then provided in G.L. 1956 (1969 Reenactment) § 9–9–3.[2] Mr. Travers testified that he mailed out jury questionnaires that notified prospective jurors of the exemption. There was a space on the questionnaire in which a prospective juror could claim the exemption. Persons who failed to exercise the exemption on the questionnaire and who were subsequently called for jury duty could be excused by presenting proper documentation of their academic status. Any person who chose to waive the exemption would be permitted to serve on the jury panel.

Mr. Travers further testified that, according to statistics that he kept for the years 1979 and 1980, 82 percent of college stu-

---

2. At the time defendant's indictment was returned, G.L. 1956 (1969 Reenactment) § 9–9–3 provided an exemption from jury duty to "the president, professors, tutors, and students of recognized universities and colleges." On May 15, 1980, the General Assembly abolished the academic exemption. See § 9–9–3, as amended by P.L. 1980, ch. 242, § 2.

dents and 88 percent of college professors who were eligible for the exemption claimed it. A member of the Public Defender's staff also testified about his examination of jury-panel questionnaires for the period 1979–80. He stated that he found that 100 percent of those eligible for the academic exemption in Providence-Bristol County exercised it. He noted that there were only four people eligible for the exemption during that period.

The defendant asserts that the method of jury selection employed at the time of his indictment and trial violates the fair-cross-section principle enunciated by the United States Supreme Court in *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).[3] He claims that this method of exemption is just as violative of that requirement as the method condemned by this court in *State v. Jenison,* R.I., 405 A.2d 3 (1979).

In response to this assertion, we direct defendant to our recent discussion and holding on the very same issue in *State v. Courteau,* 461 A.2d 1358, 1363–1365 (R.I. 1983). In that case, the defendant presented identical evidence regarding the 100 percent exemption rate for academics during the 1979–80 period. The defendant there raised the identical issue of whether an exemption accorded to members of a cognizable class may render the composition of a grand jury constitutionally infirm because of a failure to comply with the fair-cross-section requirement of *Duren* and *Taylor,* as applied by this court in *State v. Jenison,* R.I., 405 A.2d 3 (1979). *See State v. Courteau,* 461 A.2d at 1363.

▇ After extensive discussion of these cases and of the underlying state interest in exempting certain professional classes from jury duty, we concluded that "the exemptions provided from jury service by the Rhode Island Legislature at the time relevant to this indictment were reasonable and did not violate the cross-section requirements imposed by the Sixth Amendment to the Constitution of the United States." *Id.,* 461 A.2d at 1365. We believe that our ruling in that case is controlling in the instant case.

## VI

Finally, defendant contends that the trial justice erred in his instructions to the jury on the definition of "reasonable doubt." The defendant points out that the trial justice equated "reasonable doubt" with "actual and substantial doubt." The defendant correctly notes that in *State v. Thorpe,* R.I., 429 A.2d 785 (1981), this court explicitly disapproved of an instruction equating the term "reasonable doubt" with the phrase "substantial doubt." We ruled that thereafter trial justices should avoid the use of the term "substantial" when defining "reasonable doubt." *Id.* 429 A.2d at 790 n. 4.

▇ Moreover, the defendant recognizes that in *State v. Ballard,* R.I., 439 A.2d 1375 (1982), we refused to apply our holding in *Thorpe* retroactively with respect to a "substantial doubt" instruction. We stated that we could not "fault the trial justice for instructing the jury on the law as it existed at that time [prior to the *Thorpe* decision]." *Id.* 439 A.2d at 1387. We reiterated that position recently in *State v. Romano,* R.I., 456 A.2d 746, 764 (1983). We see no reason to alter it in the instant case, since the defendant's trial occurred well before our decision in *Thorpe.*

For the reasons stated, the defendant's appeal is denied and dismissed, the judg-

---

**3.** In *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) the Supreme Court held that "the selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." *Id.* at 528, 95 ‛S.Ct. at 697, 42 L.Ed.2d at 697. The Court further ruled that that requirement was violated by the systematic exclusion of women from venires. *Id.* at 531, 95 S.Ct. at 698, 42 L.Ed.2d at 698. In *Duren v. Missouri,* the Court held that the automatic self-exemption of women was also violative of the fair-cross-section requirement because it still resulted in the systematic exclusion of women. 439 U.S. 357, 359–60, 99 S.Ct. 664, 666, 58 L.Ed.2d 579, 584 (1979).

ment of conviction is affirmed, and the papers in the case may be remanded to the Superior Court.