STATE

v.

Mark SAMPSON.

No. 2008–311–C.A.

Supreme Court of Rhode Island.

July 8, 2011.

Lauren S. Zurier, Department of Attorney General, for Plaintiff.

Janice Weisfeld, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J.,
GOLDBERG, FLAHERTY, ROBINSON,
and INDEGLIA, JJ.

## OPINION

Justice ROBINSON for the Court.

The defendant, Mark Sampson, appeals from a judgment of conviction for second degree child abuse after a bench trial in the Superior Court for Kent County. On

1. Mr. Sampson raises a number of issues on appeal. However, we shall limit our "Facts and Travel" narrative to what is relevant to the legal issue upon which our decision is predicated.

2. We have changed the name of the child who was allegedly abused, in order to protect his privacy.

3. General Laws 1956 § 11–9–5.3, entitled "Brendan's Law," is quoted in greater part in footnote 10, *infra*. With respect to the specific provisions enumerated in the criminal in-

appeal, the defendant contends that the trial justice committed reversible error because, in his view: (1) G.L.1956 § 11–9–5.3 (the statute pursuant to which the defendant was convicted) is unconstitutionally vague; (2) the evidence was insufficient for an adjudication of guilt and for denial of the defendant's motion for new trial; (3) the defendant did not knowingly, intelligently, and voluntarily waive his right to counsel; and (4) it was an abuse of discretion to adjudicate the defendant guilty and to deny the defendant's motion for new trial.

For the reasons set forth in this opinion, we vacate the judgment of the Superior Court.

## I

### Facts and Travel [1]

On September 27, 2007, defendant, Mark Sampson, was charged by criminal information with second degree child abuse. The criminal information set forth the charge in pertinent part as follows:

"That Mark Sampson, * * * on days and dates between July 30, 2007 and August 3, 2007, * * * did abuse [Jacob], a child, by inflicting upon said child a serious physical injury, not resulting in permanent disfigurement or disability, in violation of [G.L.1956] § 11–9–5.3(b)(2)(d)(e)* * *." [2,3]

formation, the statute reads in pertinent part as follows:

"(b) Whenever a person having care of a child * * * knowingly or intentionally:
"* * *
"(2) Inflicts upon a child *any other serious physical injury*, shall be guilty of second degree child abuse.
"* * *
"(d) For the purpose of this section, '*other physical injury*' is defined as any injury, other than a serious bodily injury, which arises other than from the imposition of nonexcessive corporal punishment.

It is undisputed that Jacob is defendant's son, who was three years old when the child abuse allegedly occurred.

## A

### The Defendant's Waiver of Counsel and Waiver of a Trial by Jury

Mr. Sampson's trial commenced on April 7, 2008 in the Superior Court. Just prior to the *voir dire* process with respect to prospective jurors, defense counsel addressed the court regarding certain concerns that defendant wished to raise. Counsel, speaking on Mr. Sampson's behalf, stated that Mr. Sampson was "alleging ineffective assistance of counsel because [the attorney] [was] not going to call [defendant's other] son, [Michael], as a witness." [4] Mr. Sampson, speaking on his own behalf, added that he "didn't want a jury trial, but [his attorney] wants to have a jury trial * * *."

Addressing the disagreement over whether or not to call Michael as a witness, the trial justice indicated to Mr. Sampson (1) that he "presume[d] that there [was] a valid tactical reason" for the attorney's decision and (2) that ineffective assistance of counsel is usually alleged in the context of a postconviction proceeding. Mr. Sampson responded that "it [was] good enough to have on record." In response to that statement, the trial justice indicated that they were, in fact, making a

record; he then proceeded to deal with the jury trial issue.

With respect to the jury trial issue, the following exchange between defendant's attorney and the trial justice occurred:

"[DEFENSE COUNSEL]: * * * The issue of a [b]ench versus a jury trial, Mr. Sampson and I discussed that way back when I was first appointed * * *. We had been going back and forth[.] I have spoken to several attorneys, including the attorney who litigated the *Thorpe* case, and based upon all the information that I have * * * I do believe that it is in Mr. Sampson's best interest based on the work that I have done in preparing for this case, not to waive the jury trial. *That's my strategic decision,* and whether or not to call a specific witness or put—what questions to ask of a specific witness, *these are decisions that are made by counsel, not by the client.* The client decides whether or not he wants to testify. *I've advised Mr. Sampson in this regard.* " * * *

"THE COURT: * * * [Y]our reading of Strickland is that this decision is defense counsel's to make?

"[DEFENSE COUNSEL]: It is, your honor." (Emphasis added.) [5]

Following the just-quoted exchange, the trial justice proceeded to advise defendant

---

"(e) * * * Any person who is convicted of second degree child abuse shall be imprisoned for not more than ten (10) years, nor less than five (5) years and fined not more than five thousand dollars ($5,000)." (Emphasis added.)

4. As we did with the boy who was allegedly abused, we have changed the name of defendant's other son, in order to protect his privacy.

5. It is clear from the context that defense counsel's reference to the *"Thorpe"* case was to *State v. Thorpe*, 429 A.2d 785 (R.I.1981)

and that the trial justice's reference to *"Strickland"* was to *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The reader should note that, in the exchange that is quoted in the text (which took place in open court), the trial justice in no way took issue with defense counsel's statement as to who has the right to decide whether or not to waive a trial by jury—even though, as will be discussed *infra*, counsel's statement was wrong.

of the rules governing attorney conduct in this jurisdiction, and he again advised defendant that he would be able to address, in a postconviction relief proceeding, what he considered to be his attorney's ineffective assistance. The following ensued:

"THE COURT: * * * [W]e do have rules that are set by our Supreme Court that [govern] attorney conduct in these proceedings, and specifically in the Supreme Court Rules Article 5 Rule Number 2 which involves the role of a counselor, and Rule 2.1 involves just what [your attorney] is obligated to do as both your attorney and as an officer of this [c]ourt in representing a client. I'm quoting, 'A lawyer shall exercise independent professional judgment and render candid ...' I emphasize, '... candid advice. In rendering advice a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors that may be relevant to a client's situation.' Now, the commentary with regard to that rule says in part, 'Legal advice often involves unpleasant facts and alternatives that a client may be disinclined to confront. However, a lawyer shall not be deterred from giving candid advice by the prospect that that advice will be unpalatable to the client.'

"MR. SAMPSON: That's advice though, sir, that is not the ultimate decision. That's advice.

"THE COURT: Ultimately, in addition to his duty to you[,] [your attorney] *is required to proceed in a way that is calculated to get you the fairest and the best trial and try to [e]nsure the best chance of your acquittal of these charges. I quite agree with the decision to put your matter in front of a jury.*

"MR. SAMPSON: Okay, I understand that you agree, but that doesn't—

does that mean that it is actually right, sir? Not questioning your authority.

"THE COURT: I know, Mr. Sampson. *The only way to judge that would be if this matter were to proceed to a jury and if you were to be convicted, at that point an Appellate Court or probably in a proceeding for post-conviction relief there would be an opportunity to present that question, that the decision to retain or to move forward with a jury trial in lieu of a Bench trial was, in fact, the wrong decision and it made for a good case of ineffective assistance of counsel.* The argument may be more persuasive if it was reversed, that [your attorney] was insisting that we have a Bench trial and they avoid a jury trial. That may be a better argument in some cases depending on the specific facts, but I appreciate your placing this on the record, I'll treat it as a motion. I'm going to deny your motion. Is there anything else we need to address before the jury arrives?

"[DEFENSE COUNSEL]: No, your Honor. Thank you.

"THE COURT: Very well, Mr. Sampson. Thank you for your comments. I can assure you our court reporter has taken down your comments, and as soon as the jury arrives we'll commence the process of jury selection, we'll be in recess until then." (Emphasis added.)

After the above-referenced recess, the jury *voir dire* commenced. At the conclusion of the *voir dire* process, defendant asked to address the court; and, with the prospective jurors not being present, defendant indicated that he was concerned about the composition of the jury. The defendant also stated that he was not satisfied with counsel. The trial justice then began to pose the necessary questions to defendant so that he could assure himself that his waiver of counsel and decision to

represent himself was voluntary and knowing and intelligent. Before completing his inquiry of defendant, however, the trial justice continued the trial to April 9, 2008; he said that he was continuing the trial so that Mr. Sampson and his attorney could review the relevant case law with respect to waiver of counsel and so that Mr. Sampson could decide whether or not he wished to waive his right to an attorney.

On April 9, 2008, as defendant's trial resumed, defendant's attorney indicated to the court that defendant's desire to waive his attorney persisted. The trial justice then continued his inquiry of Mr. Sampson with respect to whether or not he wished to represent himself. The following brief exchange ensued:

"THE COURT: I remember at the end of the discussion before we had completed it you told me you didn't have the ability to represent yourself; do you remember that?

"MR. SAMPSON: Yes, sir.

"THE COURT: Do you still feel that way today?

"MR. SAMPSON: No. I feel that I don't want the support of [this attorney]. *If it is the only alternative that I have, I will proceed.*

"THE COURT: We're going to proceed today with you in charge of your own defense or with [this attorney]. So, do you feel that you can represent yourself today?

"MR. SAMPSON: Yes." (Emphasis added.)

The following exchange, which occurred shortly thereafter and which we quote in pertinent part, is also of relevance:

"THE COURT: Now, in light of the penalty that you might suffer, if you are found guilty, and in light of all the difficulties of you representing yourself, do you still desire to represent yourself, Mr. Sampson, and give up your right to be represented by a lawyer?

"MR. SAMPSON: (Brief pause) Yes, sir.

"THE COURT: You don't sound very sure of that, sir.

"MR. SAMPSON: Your honor, I have to have confidence within my counsel and I don't. So I feel as though I have to step up myself. I don't have, as I stated, I don't have the money myself for counsel. If I did, I would definitely do that.

"THE COURT: Your problem is primarily you don't like the advice you're getting from [your attorney]?

"MR. SAMPSON: We're going in two different directions, sir, and I feel something is, you know, not being addressed.

"THE COURT: *And you understand that you certainly are going to be able to make a case for that in a post trial proceeding with regard to [your attorney's] effective representation of you;* do you understand that much?

"MR. SAMPSON: Yes.

"THE COURT: Very well. It seems to me that it is very important that we have this conversation, that you are not comfortable representing yourself; is that true?

"* * *

"MR. SAMPSON: I'm trying to win the case. I'm not the greatest—I'm not the most comfortable but I'm content.

"* * *

"THE COURT: Content with what?

"MR. SAMPSON: Trying to resolve it for myself.

"THE COURT: Even though you are not the most comfortable—

"MR. SAMPSON: Yes, sir. *We have two different avenues that we're taking. He wants to go with a jury, I want to go straight up against the judge.*

" * * *

"THE COURT: In other words, you would desire to proceed without a jury this morning; is that correct?

"MR. SAMPSON: Yes, sir." (Emphasis added.)

Shortly thereafter, the trial justice made the following ruling on the record with respect to Mr. Sampson's waiver of his right to counsel:

"I find in light of the *extensive* discussion that you and I have had that based on your answers, you are knowingly and voluntarily waiving your right to counsel and I'm going to allow you to represent yourself * * *." (Emphasis added.)[6]

Having determined that Mr. Sampson's waiver of his right to counsel passed constitutional muster, the trial justice proceeded to consider the request for a waiver of jury trial that Mr. Sampson had filed. After a brief colloquy with Mr. Sampson regarding that issue, the trial justice granted his request to waive the jury.

## B

### The Bench Trial

Mr. Sampson's trial continued before a justice of the Superior Court (the same justice as presided over the above-described proceedings) sitting without a jury on April 9, 10, and 11, 2008. Mr. Sampson represented himself at that trial, with standby counsel being present.

The prosecution presented two witnesses—Elisa C.[7] (the child's mother) and Cheryl Trager (the physician's assistant who examined the child at Elisa's request).[8]

Elisa testified at trial that, on July 30, 2007, Mr. Sampson picked up their two children for a "visitation" and that, on August 3, 2007, Mr. Sampson returned the children to her care. It was Elisa's testimony that, the next day, August 4, she was helping Jacob with his toilet training when she "saw bruises and other marks on his behind." According to Elisa, she asked Jacob what had happened, and he responded: "Daddy spanked me." It was Elisa's testimony that she spoke with defendant shortly thereafter; she stated that defendant admitted to spanking Jacob and that defendant told her that "the kids are bad and he had to discipline him." Elisa testified that she photographed Jacob's buttocks and then "brought him to the pediatrician." It was Elisa's testimony that, after she took Jacob to the pediatrician, she went to the Wickford State Police Barracks and provided the police with a statement.

Cheryl Trager testified at trial that she was the physician's assistant who examined Jacob on August 4, 2007. She testified that the examination was "very nor-

---

6. We pause to observe that the trial justice's inquiry into Mr. Sampson's waiver of counsel was, in fact, *extraordinarily extensive*—touching upon Mr. Sampson's education, occupation, familiarity with the rules of evidence and procedure, familiarity with the charge he faced, and the penalties that could be imposed upon one convicted of such charge, etc. For the purposes of the instant appeal, we need not and do not set forth every aspect and detail of the colloquy that the record reflects, but we wish to acknowledge the precision, thoroughness, and courtesy with which the trial justice conducted the requisite inquiry.

7. We shall refer to Elisa only by her first name, in order to further protect the privacy of the two children involved in the instant case. We certainly intend no disrespect.

8. We narrate a very abbreviated version of the testimony presented by the prosecution at trial in order to provide the context within which the underlying allegation arose. Since this opinion will not delve into the weight or sufficiency of the evidence, we need not and do not present a thorough recitation of all of the evidence elicited at trial.

mal * * * except for diffuse bruising on [Jacob's] buttocks, the left cheek greater than the right cheek." Ms. Trager further testified that, on Jacob's "left buttocks, * * * he had two linear parallel abrasions that were about two centimeters long." In Ms. Trager's estimation, based upon "[t]he extent of the bruises and the placement," the bruising "appear[ed] to be not accidental." It was Ms. Trager's testimony that, in view of the observations that she made during her physical examination of Jacob, she was required to contact the Department of Children, Youth and Families. She stated that she "called the child abuse hotline" and completed a standardized form to document her observations.

### C

#### The "Memorandum of Decision"

On April 22, 2008, a "Memorandum of Decision" was issued. In that document, the trial justice summarized the travel of the case, as well as the testimony and evidence presented at trial. The trial justice also made certain credibility determinations with respect to each witness. He determined that Ms. Trager was "completely candid and credible" and that Elisa was "credible with regard to her account of the relevant facts of this case."

The trial justice then proceeded to make certain additional factual findings, which he indicated had been proven beyond a reasonable doubt. Among those findings were the following: (1) that defendant "administered corporal punishment to the victim by spanking or otherwise striking the victim on his buttocks;"[9] (2) that "[i]n administering corporal punishment upon the victim * * *, the [d]efendant inflicted injuries to the buttocks of the victim;" (3) that "[t]he corporal punishment administered by [d]efendant to the victim caused bruising to victim's buttocks;" and (4) that "[d]efendant acted intentionally, purpose[fully], and knowingly each time he administered corporal punishment to the victim."

The trial justice proceeded to indicate that "[t]he sole remaining issue to be resolved involve[d] a determination of whether [d]efendant's administering of corporal punishment to the victim was *excessive* within the meaning of the law" (emphasis added) and that "[r]esolution" of that issue would begin "with an analysis of the relevant portions of Brendan's Law."[10] In so

---

9. In the "Court's Findings of Fact" portion of the "Memorandum of Decision," the trial justice referred to the "victim" as being defendant's three-year-old child; earlier in the memorandum, he had indicated that, "[d]ue to the child's age and considerations of privacy," he would not refer to the child by name.

10. It will be recalled that § 11–9–5.3, entitled "Brendan's Law," is the statute pursuant to which defendant was charged by criminal information with second degree child abuse. That statute provides in pertinent part as follows:

"(b) Whenever a person having care of a child * * * knowingly or intentionally:

"(1) Inflicts upon a child *serious bodily injury,* shall be guilty of first degree child abuse.

"(2) Inflicts upon a child *any other serious physical injury*, shall be guilty of second degree child abuse.

"(c) For the purposes of this section, '*serious bodily injury*' means physical injury that:

"(1) Creates a substantial risk of death;

"(2) Causes protracted loss or impairment of the function of any bodily parts, member or organ, including any fractures of any bones;

"(3) Causes serious disfigurement; or

"(4) Evidences subdural hematoma, intercranial hemorrhage and/or retinal hemorrhages as signs of 'shaken baby syndrome' and/or 'abusive head trauma.'

"(d) For the purpose of this section, '*other physical injury*' is defined as any injury, other than a serious bodily injury, which

doing, the trial justice observed that, in a 1995 version of the statute, the term "serious physical injury" was defined as "any injury, other than a serious bodily injury, which arises other than from the imposition of nonexcessive corporal punishment." He then stated that "[t]he *definition* has remained constant through the years up to and including the present time." (Emphasis in original.) The trial justice noted that legislation which was enacted in 2001 "shows a strikethrough of the word 'serious' in the definition section dealing with the term 'serious other physical injury.'" He concluded his analysis of the statutory provisions as follows:

> "The Public Laws of 2001, Chapter 109 depicts that the definition *remains exactly the same.* An examination of the underlying legislation, including the original draft as well as the final amended form of the bill again *reveals no change to the definition* that has been in existence since the very beginning. To construe any change to the definition based upon what is depicted in the Public Laws of 2001 would amount to a repeal of the crime of second degree child abuse. This is clearly not the Legislature's intent and would amount to an absurd result." (First emphasis in original; second emphasis added.)

Accordingly, the trial justice's ruling of law with respect to the statute was that the definition of the term "other serious physical injury" in (b)(2) of § 11–9–5.3 (the section pertaining to second degree child abuse) was the same as the definition for "other physical injury" which was provided in (d), despite the fact that the term in (b)(2) contained the word "serious."

Having so ruled, the trial justice proceeded to determine whether or not the bruising on Jacob's buttocks constituted "any injury, other than a serious bodily injury, which arises other than from the imposition of nonexcessive corporal punishment." He first determined that the bruising "clearly qualifie[d] as 'any injury.'" He next determined that, "as set forth in the testimony of the witnesses, the bruising on the victim's buttocks [did] not rise to the level of a 'serious bodily injury.'" (A "serious bodily injury" is what would be required for a charge of first degree child abuse.)

The trial justice then proceeded to engage in an analysis of whether or not Jacob's injury arose from excessive corporal punishment. The trial justice relied primarily on this Court's decision in *State v. Thorpe*, 429 A.2d 785 (R.I.1981), for guidance with respect to what constitutes excessive corporal punishment. The trial justice's "Memorandum of Decision" reads in pertinent part as follows:

> "There is no inflexible rule that defines what, under all circumstances, is unreasonable or excessive force. The accepted degree of corporal punishment must vary in relation to the sensitivity and character of the child, the child's age, sex, physical condition, as well as in relation to the particular offense for which punishment is to be meted out. The word 'excessive' is sufficient to convey the meaning that a parent may inflict corporal punishment to discipline and correct the child, but may not do so to vent his/her anger or frustration on the child. The test of unreasonableness is met at the point at which a parent ceases to act in good faith and with

arises other than from the imposition of nonexcessive corporal punishment.

"(e) * * * Any person who is convicted of second degree child abuse shall be imprisoned for not more than ten (10) years, nor less than five (5) years and fined not more than five thousand dollars ($5,000)." (Emphasis added.)

parental affection and acts immoderately, cruelly, or mercilessly with a desire to inflict pain, rather than make a genuine effort to correct the child by proper means." (Internal citation omitted.)

Having set forth the general parameters of the definition of "excessive" in the context of corporal punishment, the trial justice made a determination with respect to the evidence and testimony presented at Mr. Sampson's trial. His ruling provided in pertinent part as follows:

"[T]he [c]ourt finds beyond a reasonable doubt that [d]efendant's actions were excessive. The corporal punishment that left the bruises * * * is excessive. The punishment, in leaving such bruises, goes beyond usual, necessary, right, proper, or just considering the situation in its complete context. The extent of the punishment, as evidenced by the bruises, is out of proportion to the offenses for which the punishment was meted out. * * * [T]he [c]ourt finds beyond a reasonable doubt that the [d]efendant was motivated by anger and frustration in administering the particular corporal punishment to the extent he did."

The trial justice's "Memorandum of Decision" concluded with the following adjudication of guilt:

### "GENERAL FINDING

"Because the [c]ourt has found the corporal punishment administered by the [d]efendant to be *excessive* beyond a reasonable doubt[,] the [c]ourt finds that the [d]efendant is guilty as charged." (Emphasis added.)

On May 2, 2008, defendant filed a motion for new trial. On June 17, 2008, defendant's motion was heard and denied; and defendant was sentenced to five years, with fifteen months to serve and the remainder suspended with probation. A judgment of conviction entered on June 27, 2008. The defendant filed a timely notice of appeal.

## II

### Standard of Review

■ With respect to a trial justice's determination as to whether or not a criminal defendant's waiver of his or her Sixth Amendment right to counsel is knowing, voluntary, and intelligent, we review same in a *de novo* manner, while deferring to the trial justice's findings of historical fact. *State v. Laurence*, 848 A.2d 238, 253 (R.I. 2004); *see also State v. Brumfield*, 900 A.2d 1151, 1153 (R.I.2006); *State v. Thornton*, 800 A.2d 1016, 1026 (R.I.2002).

■ We review questions of statutory interpretation in a *de novo* manner. *State v. Graff*, 17 A.3d 1005, 1010 (R.I.2011); *see also In re Brown*, 903 A.2d 147, 149 (R.I. 2006).

## III

### Analysis

#### A

### The Defendant's Waiver of His Right to Counsel

■ Mr. Sampson argues on appeal that he never knowingly, intelligently, and voluntarily waived his right to counsel. In defendant's view, the trial justice "erred in forcing him to choose to defend himself *pro se* or proceed to trial with an attorney who refused to implement Mr. Sampson's personal right to waive a jury." We agree.

■ A criminal defendant has a right to an attorney pursuant to the Sixth Amendment to the United States Constitution. U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right * * * to have the assistance of coun-

sel for his defense."). A defendant may waive that right to counsel and proceed *pro se*, provided that the waiver is given voluntarily, knowingly, and intelligently. *E.g., State v. Chabot*, 682 A.2d 1377, 1379 (R.I.1996); *see also Faretta v. California*, 422 U.S. 806, 834–35, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

■ In conducting a determination as to whether or not a defendant's waiver of counsel was voluntary, knowing, and intelligent, this Court "looks to the *totality of the circumstances*" and will consider a waiver properly "effectuated only if a defendant *knows what he [or she] is doing and his [or her] choice is made with eyes open.*" *Chabot*, 682 A.2d at 1379–80 (brackets in original) (emphasis added) (internal quotation marks omitted); *see also Faretta*, 422 U.S. at 835, 95 S.Ct. 2525.

■ Separate and apart from a criminal defendant's right to the assistance of counsel is the right to a trial by jury; and, significantly, a defendant in this jurisdiction has the right to waive the jury and proceed with a bench trial. In Rhode Island, this Court has *explicitly* stated that the decision whether or not to waive the jury is ultimately the decision of the *defendant* and not of counsel. In *State v. Moran*, 605 A.2d 494 (R.I.1992) we wrote as follows with respect to that issue:

"Rhode Island law is well settled that a criminally accused defendant has an absolute right to waive a trial by jury if the waiver is knowing, intelligent, and voluntary. This substantive right to invoke a bench trial *belongs to the defendant and is subject only to the procedural requirement that a trial justice determine that the defendant understands and accepts the consequences of*

*executing a waiver.*" *Id.* at 496 (emphasis added) (internal citations omitted).[11]

Unfortunately, and contrary to the clear pronouncement of this Court, defendant's attorney advised the trial justice that the decision as to whether or not to waive the jury belonged to him as Mr. Sampson's attorney and not to Mr. Sampson. While this Court certainly does not entertain even the slightest suspicion that defendant's attorney was attempting to purposefully mislead the trial justice, at the end of the day the attorney's erroneous statement of law, coupled with the trial justice's acquiescence therein, ultimately infected Mr. Sampson's waiver of counsel.

It is clear from the record that the trial justice accepted defense counsel's representation as to who ultimately decides whether or not to waive the jury, and he proceeded to advise defendant in accordance with what defense counsel had said. The trial justice erroneously suggested to defendant that the decision as to whether or not to waive the jury was addressed in Article V, Rule 2.1 (and the comments thereto) of the Supreme Court Rules of Professional Conduct, which Rule states that "a lawyer shall exercise independent professional judgment and render candid advice." The more pertinent rule would have been Article V, Rule 1.2(a) of the Supreme Court Rules of Professional Conduct, which states in pertinent part:

"In a criminal case, the lawyer *shall abide by the client's decision*, after consultation with the lawyer, as to * * * whether to waive jury trial * * *." (Emphasis added.)

The trial justice also erroneously suggested to defendant on numerous occa-

---

**11.** *See also Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) ("It is also recognized that the accused has the *ultimate authority* to make certain fundamental decisions regarding the case, as to whether to plead guilty, *waive a jury*, testify in his or her own behalf, or take an appeal[.]") (emphasis added).

sions that, if he disagreed with his attorney's decision to proceed with a trial by jury, the appropriate forum wherein to pursue that grievance would be a postconviction proceeding. Essentially, Mr. Sampson was provided with two choices: (a) a trial by jury, against his wishes, represented by counsel or (b) a bench trial, in accordance with his wishes, representing himself. More unfortunate perhaps is the suggestion by the trial justice that Mr. Sampson should have elected to pursue option "(a)," take his chances under that option, and hope that the jury would not find him guilty, retaining postconviction relief as a remedial avenue if he were found guilty. A third choice was never presented to him: *viz.*, (c) a bench trial, in accordance with his wishes, represented by counsel.[12]

Because Mr. Sampson was never provided with that third choice and was never properly informed that the decision as to whether or not to waive the jury was his to make, his decision to waive his right to counsel was not voluntary, knowing, or intelligent. Having determined that Mr. Sampson's waiver of counsel was not voluntary, knowing, and intelligent, in violation of his Sixth Amendment constitutional right, we vacate the judgment of conviction. Furthermore, because the defect in Mr. Sampson's waiver of counsel was so pervasive—affecting nearly every aspect of

the trial—Mr. Sampson must be afforded a new trial on remand. *See United States v. Tatum*, 943 F.2d 370, 373 (4th Cir.1991) (holding, on appeal from a bench trial, that "[b]ecause we conclude that Tatum's counsel had conflicts of interest which deprived Tatum of the effective assistance of counsel during critical stages in the prosecution, we reverse and remand the case for *a new trial*") (emphasis added).[13]

## B

### The Trial Justice's Interpretation of Brendan's Law

■ Since we have determined that Mr. Sampson's waiver of his right to counsel did not comport with what the United States Constitution requires, we need not and do not address his arguments with respect to the vagueness *vel non* of the statute. However, we pause briefly to impart a specific instruction to the Superior Court with respect to the proceedings on remand.

As currently drafted, Brendan's Law distinguishes between first and second degree child abuse based upon the nature of the injury inflicted or sustained. Subsection (b)(2) of § 11–9–5.3, the section pursuant to which defendant was charged, states that the injury required to sustain a conviction for second degree child abuse is: "*any other serious physical injury.*"[14]

---

12. We pause to observe and acknowledge that defendant's attorney indicated to the Superior Court that Mr. Sampson's disagreements with him and with his representation of defendant were much broader and more numerous than the one issue involving defendant's preference for a bench trial. It may be that, if the trial justice had been properly informed of the law and had instructed defendant's attorney to accede to defendant's wishes with respect to the waiver of the jury, Mr. Sampson might still have decided to waive his right to that attorney's counsel. But that is not what happened, and our decision in this case must be predicated upon what did happen.

13. Having determined that Mr. Sampson's waiver of his right to counsel was not valid, and vacating on that basis, we need not and specifically do not address the other issues that Mr. Sampson has raised on appeal.

14. It will be recalled that "any other serious physical injury" is to be distinguished from "serious *bodily* injury" (emphasis added) which is the injury required to sustain a charge of first degree child abuse pursuant to subsection (b)(1) of § 11–9–5.3. Subsection (c) of § 11–9–5.3 provides what is essentially a laundry list definition of "serious bodily injury."

Subsection (d) of § 11–9–5.3 provides a definition of *other physical injury* as being "any injury, other than a serious bodily injury, which arises other than from the imposition of nonexcessive corporal punishment."

In conducting statutory analysis in his "Memorandum of Decision," the trial justice construed the statute so as to, in effect, *delete* the word *"serious"* from subsection (b)(2) of § 11–9–5.3; he did so by ruling that the definition in subsection (d) was sufficient alone to describe the injury set forth in subsection (b)(2).[15] We hold that it was error to do so. The statute, as currently drafted, contains the word *serious* in subsection (b)(2) of § 11–9–5.3; accordingly, an adjudication that a defendant is guilty of second degree child abuse requires a determination as to whether or not the defendant inflicted a *serious* physical injury. Such a determination will have to be made at the conclusion of the defendant's new trial on remand before he can be adjudged guilty of second degree child abuse.

**15.** We note that the trial justice is not alone in his struggles to decipher what § 11–9–5.3 requires to be proven in order to sustain a charge of second degree child abuse. In the instant case, two justices of the Superior Court were called upon to interpret the meaning of the provisions of Brendan's Law (the trial justice who presided over defendant's bench trial, as we describe in section "I C" of this opinion, as well as another justice who had previously heard defendant's motion to dismiss). Without going into detail about their reasoning, it suffices to say that the trial justice and the just-referenced hearing justice arrived at *different* conclusions as to the statute's meaning.

We further note that, in its argument before this Court during oral argument, the state candidly asserted that the Office of the Attorney General had submitted legislation to *correct* Brendan's Law. Based upon the brief provided to this Court by the state, in the state's view, a desirable way to "correct"

## IV

### Conclusion

For the reasons set forth in this opinion, we vacate the judgment of the Superior Court. The record in this case may be returned to that tribunal for a new trial consistent with this opinion.

GOLDBERG, J., with whom SUTTELL, C.J., joins, dissenting.

I respectfully dissent from the decision of the majority. It is my opinion that the majority's conclusion that the defendant's Sixth Amendment right to the assistance of counsel was violated is unsupported and incorrect. As the record in this case demonstrates, the defendant was greatly dissatisfied with everything his lawyer was attempting to do in his defense. The defendant began complaining about his court-appointed counsel—his second appointed attorney—during the pretrial stage of this case, before a different trial justice (the hearing justice).[16] The record discloses that every single time the defen-

Brendan's Law would be to, as the trial justice did in the instant case, delete the word "serious" from (b)(2) of § 11–9–5.3. We would note that such an interpretation would essentially mean that second degree child abuse requires the same conduct as that described and defined by this Court in *State v. Thorpe*, 429 A.2d 785 (R.I.1981)—a case in which the defendant was charged with simple assault and battery, a misdemeanor rather than a felony. While it may be that the General Assembly's intent with respect to the present statute was to equate the felony of second degree child abuse with the misdemeanor described in *Thorpe*, such an intent cannot be gleaned with confidence from the statute before us.

**16.** This first hearing justice, as will be established, was quite familiar with this defendant, such that Sampson sought to disqualify the hearing justice from presiding over the trial. The case eventually was reassigned to the trial justice because of scheduling.

dant appeared in Superior Court, he addressed the presiding judge and expressed his dissatisfaction about a litany of grievances; a list that expanded as the proceedings progressed. The question of whether the defendant faced a violation hearing from a previous conviction, based on this child-abuse allegation, was a point in contention. Both the hearing justice and the trial justice repeatedly informed the defendant that to the extent the violation does exist, it would be postponed to the end of trial. This ruling was unacceptable to the defendant and he refused to accept it. He blamed his attorney for this circumstance, a situation that, in my opinion, set the stage for Sampson's eventual insistence that he proceed without counsel.

I note at the outset that we determine the validity of a waiver of counsel by examining the totality of the circumstances. *State v. Laurence*, 848 A.2d 238, 253 (R.I. 2004). The first question is whether the waiver of counsel was voluntary, and if so, we then must decide whether, based on the totality of the circumstances, it was knowing and intelligent. *Id.* (citing *State v. Thornton*, 800 A.2d 1016, 1025 (R.I.2002)). It also is important to note that in the absence of a record showing of good cause for a defendant's refusal to accept court-appointed counsel, "such refusal is functionally equivalent to a voluntary waiver of the right to counsel." *Id.* (quoting *Thornton*, 800 A.2d at 1025). This Court has held "that [a] defendant's 'repeated refusal to accept the services of competent court-appointed defense counsel demonstrates clearly the voluntary waiver of his right to counsel, and that he was not in any way unconstitutionally 'forced' to proceed *pro se*." *Id.* (quoting *Thornton*, 800 A.2d at 1026). In *Thornton*, we noted that the defendant, who without good reason, rejected the services of "three different, capable, experienced court-appointed defense attorneys," voluntarily waived his right to counsel. *Thornton*, 800 A.2d at 1025–26. Further, we declared that the options offered to Thornton—to continue with the services of his court-appointed lawyer, retain private counsel or proceed pro se with standby counsel—were constitutionally adequate. *Id.* at 1026.

It is well established that the Sixth Amendment right to counsel does not include the right to an attorney "who would blindly follow [a defendant's] instructions" with respect to the trial of a case. *Laurence*, 848 A.2d at 254 (quoting *Thornton*, 800 A.2d at 1029 n. 14). Moreover, the Constitution does not require that the trial justice advise the defendant of the risks of proceeding *pro se*. *Id.* at 253 (citing *Thornton*, 800 A.2d at 1026). The waiver-of-counsel inquiry must be "pragmatic and directed to the 'particular stage of the proceedings in question.'" *Id.* (quoting *Thornton*, 800 A.2d at 1027). "[T]echnical legal knowledge * * * [is] not relevant to an assessment of [a defendant's] knowing exercise of the right to defend himself [or herself]." *Id.* at 254 (quoting *Faretta v. California*, 422 U.S. 806, 836, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)).

Because we must look to the totality of the circumstances to determine whether a waiver of the right to counsel was knowing and voluntary, a detailed recitation of the travel and record of this proceeding is necessary.

After defendant's first attorney was permitted to withdraw, defense counsel entered his appearance on February 26, 2008. Counsel filed a motion to dismiss on March 5, 2008, challenging the constitutionality of the child-abuse statute and the specific allegation of second-degree child abuse pending against his client. Two weeks later, on March 13, 2008, during defense counsel's next appearance before the hearing justice, he notified the court

that the attorney-client relationship already had broken down and that defendant wished to address the court:

"[Y]our Honor, I had planned to * * * make a record with respect to the reasons why the defense contends there's no violation properly before the [c]ourt. However, I have been instructed by Mr. Sampson not to say anything whatsoever on his behalf today other than to ask the [c]ourt to grant my oral motion to withdraw because I have been fired or discharged.

"Mr. Sampson would like to address the [c]ourt, your Honor * * *. Mr. Sampson just told me that all of the motions that I just raised before your Honor are irrelevant, to use his words." [17]

According to counsel, his representation of Mr. Sampson had "been rendered absolutely unreasonably difficult by Mr. Sampson." He stated:

"I have copied Mr. Sampson on everything that I have done, I have been in contact with him on the telephone, I met with him before court this morning, I met with him at length when we were last before your Honor, I believe that was on February the 26th for at least an hour. I have put 46 hours of time into this case since I was appointed by your Honor on February the 25th. I've done a substantial amount of work on behalf of Mr. Sampson. Mr. Sampson and I have reached a point, unfortunately, where there is a complete and total breakdown of communication. Hypothetically speaking by way of illustration if I were to tell Mr. Sampson that today is Thursday, he would insist it's Friday.

If I handed him a calendar that says today is Thursday, he'd say the calendar is wrong, and I address things such as which witnesses to call, which questions to ask, which witnesses, how to respond to the [s]tate's request for discovery and alibi, trial strategy, things of that nature, * * * [if Mr. Sampson] asks me to do A, B and C, I'll say 'Well, I'm, going to do A and B, but I'm not going to do C [He tells me,] '[y]es, you are, and if you don't do it, you're fired. I fired the last lawyer, I'll fire you too.' I don't think he's attempting to delay the trial; but just as an example, with respect to the violation, I said, 'I'd like to advance some arguments on your behalf as to why the defense contends there is no violation pending.' [He responded], 'Well if you do that, then you're fired; because there isn't any violation pending.' He just doesn't seem to appreciate or understand that the [s]tate is contending a violation is pending, the defense is objecting to that contention. * * * And just that mere contention that the [s]tate is wrong is somehow indicative of the fact that I am not advancing Mr. Sampson's case or zealously representing him.

"Quite frankly, your Honor, I'm at a loss; because I had a conversation with Mr. Sampson on the phone yesterday and I thought everything was okay and I came in this morning, met with him before the in-chambers conference, and everything is most assuredly not okay. And I was not exaggerating when I used those hypotheticals. I've been a lawyer for 23 years; and I, quite frankly, I don't know how to communicate with Mr. Sampson. In view of the fact that

---

**17.** The record discloses that counsel filed a motion to dismiss that was characterized by the hearing justice as "very sophisticated." The motion was directed at the statute under which this felony charge was brought. He also filed a series of *in limine* motions and motions to suppress evidence. The hearing on the motion to suppress was continued until March 28, 2008.

there are certain elements of criminal law trial work that are clearly within the purview of the lawyer, including which witnesses to call, which questions to ask, and the formulation of trial strategy, we can't even talk about that, your Honor. I hadn't planned on coming in here and asking to withdraw. However, given Mr. Sampson's instructions to me, that's where I'm at, your Honor * * *."

The hearing justice, having previously presided over a criminal proceeding involving this defendant, disagreed that the breakdown between counsel and defendant occurred that morning and remarked as follows:

"I think that based upon the history of this case and my knowledge that Mr. Sampson knows a good deal about the criminal justice system, how it works, and all of that, I necessarily conclude based upon what is in front of me that *Mr. Sampson is purely engaging in gamesmanship* and is doing everything he can to make sure that, No. 1, I commit error; No. 2, his case does not go forward. And I think that he's of a view that if he continues to be disagreeable and not cooperative with the very excellent legal representation that he has had and will continue to have if I have anything to do with it, then he can essentially delay resolution. I've already told everyone at least twice, I think more than that, I'm not going to decide any aspect of the so-called pending violation prior to trial." (Emphasis added.)

The hearing justice proceeded to explain the raise-or-waive rule to defendant, advising him that his attorney was required to preserve the legal basis for the defense contention that the probation violation properly was not before the Superior Court. Significantly, the hearing justice observed:

"I think this is all part of a master plan that Mr. Sampson has to avoid trial starting April 7th. That trial's going forward whether Mr. Sampson has counsel or not; and I'm going to do everything I can to make sure that Mr. Sampson respectfully cooperates with his attorney so that he can get the best possible defense."

The hearing justice notified defendant that he had a constitutional right to represent himself, but that the court could order defense counsel to continue to represent him, notwithstanding his motion to withdraw. The defendant, however, remained fixated on the issue of the violation hearing and continued to argue that point, over and over again:

"I agree with everything you're saying, your Honor, and I'm not taking nothing away from this gentleman. He's telling me he has 23 years experience, all that good stuff. True, so it be. *My issue was simply with the violation once again,* which you don't want to address until the trial. My issue is simply I received a three-year sentence, two and a half years suspended, six months to serve as my controlling sentence. Not one spot on there does it say four years suspended sentence, your Honor. So that's my argument. It's that if it was to continue for the new sentence imposed as three years sentence, two and a half suspended, six months to serve." (Emphasis added.)

The defendant and the hearing justice engaged in yet another on-the-record discussion about defendant's understanding of his probation-violation status,[18] at the conclusion of which defendant declared:

18. Apparently defendant entered a plea to a cocaine-possession charge before yet another
justice of the Superior Court, was sentenced to three years imprisonment, six months to

"This is my argument. That's the *only argument I really had with [defense counsel].* And as far as him saying he was working on trying to prepare for it, we haven't even got to that. And that wasn't an argumental [*sic*] type thing. It was just an issue that hasn't been addressed." (Emphasis added.)

At this point, and at every available opportunity, defendant interjected his opinion about the merits of the case and his plight at being charged with child abuse. He alerted the hearing justice about his level of confidence in the eventual outcome of the case and looked forward to the day that it was dismissed, stating:

"I'm very confident about this case, your Honor, and I look forward to the day that it gets dismissed.

" * * *

"Cause for one, I don't think that what I'm being charged with fits the description."

The hearing justice reminded defendant that the "sophisticated" motion to dismiss that was filed by his attorney and pending before him concerned that very question of law. The court thereupon inquired of defendant as follows:

"Do you wish to be heard on the issue of whether or not we can all take a deep breath and work together to see that as best humans can do we do justice to your case? Do you wish to be heard about representation, the motion to dismiss or anything else? What I'm saying is can you tell me any reason why [defense counsel] can't represent you adequately, more than adequately I think?"

The defendant again returned to the question of the pending violation hearing,

and another fruitless discussion ensued. Finally, defendant conceded that defense counsel was a good lawyer "to an extent[,]" and declared that he wanted the case resolved:

"I just feel as though I'm being railroaded here and nobody's acknowledging it, so I can't really—I can't give him credit for something if he's not, you know, going toe to toe with you. I need somebody that's going to go toe to toe with you and with the prosecution."

On March 28, 2008, the next scheduled court date, the hearing justice, after affording counsel an opportunity to be heard, rejected defendant's constitutional challenge to the child-abuse statute and denied the motion to dismiss. The case was scheduled for trial on April 7, 2008; however, based on a scheduling conflict, it was reassigned to the trial justice—another circumstance with which defendant took issue. The trial opened with a second motion to withdraw by defense counsel, followed by two days of hearings concerning defendant's litany of complaints.

There were three long colloquies between the trial justice and defendant—separated by the seating of a jury and a one-day trial recess—concerning defendant's dissatisfaction with his lawyer, the witnesses the state intended to call, the fact that the prior hearing justice—whom defendant previously had sought to disqualify—no longer was presiding over the case, and, of course, the perennial issue of the pending probation violation. The thrust of defendant's complaints were that he did not "feel comfortable" with various aspects of the proceedings; this "discom-

---

serve, and as a result of that plea, was declared to be a violator on all of his probationary sentences and continued on the same probation. It is torturously clear in this record that defendant did not accept that circum-

stance and vigorously disagreed with the trial justice's decision to postpone the violation hearing until the time of trial, rather than accede to the state's request to hold the hearing immediately.

fort" was insurmountable and, in my opinion, would have persisted no matter how many lawyers were appointed in this case.

I pause to note that the interaction between the trial justice and this defendant was a model of patience, courtesy and respect; the record depicts a jurist who was committed to protecting this defendant's rights at every point in this trial. It was not an easy task; as has been observed on more than one occasion, this defendant is a familiar figure in the criminal courtrooms of this state, and, by his own admission, probably was in court ten times; he studied law in prison and worked in the prison library and, as the seasoned hearing justice noted, "Mr. Sampson knows a good deal about the criminal justice system, how it works, and all of that[.]"[19] In my opinion, defendant's performance, at every stage of these proceedings, was calculated and shrewd and designed to inject error into the proceedings.

At the beginning of the first colloquy between defendant and the trial justice, defendant's primary complaint was coun-sel's decision not to call his six-year-old son as a defense witness and—of course—the violation hearing remained a point of contention. The defendant addressed the court as follows:

> "How are you doing, sir? My issue was simply I'm trying to get [defense counsel] to use my son [Michael], which is my oldest child, as a witness in my behalf because we're speaking the truth as to what actually took place that particular day, and my son [Michael] was a witness to the whole thing. * * * I'm trying to be afforded the best opportunity for this whole scenario because, after all, this information did allegedly come from me to my son's mom and my son was in the presence of the whole scenario."

The trial justice patiently and painstakingly addressed defendant:

> "Mr. Sampson, I want to make sure that I've actually understood *exactly* what you are presenting to the [c]ourt *at this moment.* I want to make sure that I understand it completely. Now, this is

---

19. The victim in this case, defendant's three-year-old son, is the child of Elisa C, defendant's former girlfriend and the victim in several domestic violence cases involving this defendant. In *State v. Sampson*, 884 A.2d 399 (R.I.2005), this Court recounted defendant's abusive behavior toward Elisa C. and his conduct in the courtroom during a violation hearing conducted in Washington County Superior Court, before the hearing justice initially assigned to this case. *Id.* at 402–03. On June 26, 2002, Sampson entered a plea of *nolo contendere* to a charge of breaking and entering into Elisa C.'s home, and to domestic assault. *Id.* at 401. He was sentenced to eight years, with nine months to serve, the balance suspended, with probation. *Id.* Eight months later, on February 26, 2003, defendant was arrested for violating the no-contact order that was imposed in connection with his felony conviction. *Id.* at 402 n. 2. He was ordered to serve sixty days for that violation. *Id.* On October 8, 2003, he was arrested for assaulting a pregnant Elisa C, declared to be a violator, and was sentenced to serve three years. *Id.* at 402, 403.

At the start of the violation hearing in *Sampson*, 884 A.2d at 402, defendant declared that he had a conflict of interest with the assistant public defender who was appointed to represent him, he became unruly, refused to sit when ordered to do so, and was removed from the courtroom. *Id.* After Sampson was allowed to return to the courtroom, he again began arguing with the trial justice, refused to sit at counsel table, was declared in contempt, and once again was escorted from the courtroom. *Id.*

On appeal, Sampson assigned error to the refusal of the trial justice to grant him a continuance to obtain counsel. *Id.* at 403. He also argued that the trial justice should have recused himself because he previously had presided over a trial in which the accused was defendant's brother. *Id.* at 405. This Court rejected his appeal. *Id.* at 406.

about a disagreement between yourself and [defense counsel] with regard to whether or not to call [Michael] as a witness; is that correct?

"Mr. Sampson: Yes, sir.

"The Court: *And that is all that this is about?*

"Mr. Sampson: And also the motion with regards to the violation hearing." (Emphases added.)

After the trial justice politely, but firmly, declared that he would not make any finding with respect to the violation hearing until after trial, Mr. Sampson's list of complaints began to expand, along with his obvious attempts to inject his protestations of innocence into the record. First, he had "one more little issue with regards to DCYF[;]" next, he complained that the state was not intending to call the state trooper "that came to my job and arrested me at the Ryan Center[.]"

The defendant also expressed his concern that the case had been reassigned to the trial justice because he had had "prior conflicts of interests" with the hearing justice:

"And, also, the issue with me and [the hearing justice] that had been going back and forth with us having prior conflicts of interest and him saying he's going to stay on this case until it is finished, period, he's not removing himself from the case. Then a week before the trial begins [the hearing justice] removes himself from the case.

"The Court: Didn't you ask that [the hearing justice] remove himself from the case?

"Mr. Sampson: In the past I did, your Honor, and he said he wasn't removing himself.

"The Court: Are you aware, Mr. Sampson, he currently has a jury impaneled and he is in the middle of a jury trial in the courtroom next door? Are you aware of that?

"Mr. Sampson: Yes, I am. I'm just saying about the scheduling. He told me—I remember him saying at times he has been on this case for the longest time and been assigned this case, he is not leaving this case, he scheduled everything around this. It just—it is just a coincidence.

"The Court: Does that somehow work to your disadvantage, the fact that [the hearing justice] is not presiding over the trial today?

"Mr. Sampson: Well, actually, your Honor, I had initially wanted it to reside with a judge residing [*sic*] over the case. Myself, I didn't want a jury trial, but [defense counsel] wants to have a jury trial, so I'm trying to show you I'm not this violent person that they are putting me out to be, and I want to resolve this issue. *So, I'm willing to work with [defense counsel] because he is the counselor, but I just want to be afforded and be able to feel comfortable throughout this whole trial.*" (Emphasis added.)

The defendant wanted it both ways; he wanted the hearing justice disqualified, but objected to the reassignment of the case because, despite his differences with the hearing justice, he wanted the case to "reside with [the] judge."

The trial justice proceeded to address each of defendant's stated concerns; and, although at this point, he agreed with defendant that the decision to waive a jury was his to make, he found that the real dispute between defendant and his attorney was a disagreement about how best to proceed. To which defendant stated the following on the record:

"I just feel that [Michael]—I'm just trying to show that we have a bond that, you know—these children, I have never

actually lived in their household, but I also have other children too, and both the other moms, I have—actually, I have three baby moms, and I never actually lived with any of the moms, but from day one I have always took care of the children, always provided, always been there, always had visitation, always, you know—visitation, I was always there. So, that's my position as far as what I— I just I just feel as though [Michael] can be a witness."

The trial justice stated that he could "only presume that there [was] a valid tactical reason why [defense counsel] has opted not to call [Michael] at this time.[20]"

With respect to the jury-trial issue, defense counsel addressed the court and indicated that based on the issues in this case, particularly this Court's holding in *State v. Thorpe*, 429 A.2d 785, 788 (R.I.1981), in which we recognized a parent's right to discipline a child, defense counsel concluded that a jury trial was in defendant's best interest.

"I do believe that it is in Mr. Sampson's best interest based on the work that I have done in preparing for this case, not to waive the jury trial. That's my strategic decision, and whether or not to call a specific witness, * * * these are decisions that are made by counsel, not by the client. The client decides whether or not he wants to testify. I've advised Mr. Sampson in this regard."

I agree with the majority's conclusion that this was an erroneous statement of law that was not corrected by the trial justice. However, as the record demonstrates, at the particular stage of the proceeding, based on the totality of the circumstances, this error does not so "infect" defendant's subsequent waiver of counsel

as to amount to a violation of his Sixth Amendment right to counsel. I also note that, although defendant was an active and quite vocal participant in this discussion, he posed no objection to proceeding with a jury at this time:

"Right, if he's actually the one that is going to be in charge of the handling [of] the case, correct; but the other side of that is that we discussed these things before the ultimate decision is made. You can't disregard me as if I have no insight or I have no say on the decision. I would imagine you have to run it by me before you just make a decision."

At that point, defense counsel assured the trial justice that the issue of a jury trial had been thoroughly discussed with defendant, but, as was the case with most of counsel's decisions, defendant was not comfortable. After another discussion, the trial justice indicated that he agreed with the decision to proceed with a jury trial, to which Sampson replied: "Okay, I understand that you agree, but that doesn't— does that mean that it is actually right, sir? Not questioning your authority."

At this point defendant did not ask for a new lawyer, did not seek to terminate the services of defense counsel to proceed without a jury, nor did he ask to proceed *pro se*. It was only after a jury was seated, whose makeup was unsatisfactory to defendant, that defendant declared that he was "being railroaded." As the record in this case clearly reflects, defendant's dissatisfaction with counsel concerned a myriad of reasons and did not rest, in my opinion, on the question of a jury trial versus a bench trial.

Immediately after defense counsel announced that the jury panel as constituted was satisfactory to the defense, Sampson

---

**20.** The record reveals that the child was called as a witness on behalf of the defense and had no recollection of the events in question.

interrupted the proceedings and asked to be heard. The panel was excused and defendant declared that he was being "railroaded" because there were no persons of color on the jury and only several jurors who had children, stating:

> "I'm being railroaded. None of [the jurors] have any color to them, and I believe there may have been like three or four who actually have children out of the twelve, and I'm not comfortable with them."

The trial justice acknowledged that neither the members of the panel that were seated, nor the jury venire, included any minority persons. He placed defendant's concerns on the record. The defendant then stated that he was uncomfortable with counsel and said "that's on the record, right sir?"

Significantly, in defiance of the trial justices's clear instruction to defendant that although he would be permitted to place his concerns on the record, he must do so at the appropriate time and must, at all times, respect the decorum of the Superior Court, he refused to comply.

> "The Court: * * * Is there any question that you have to [comply with the courtroom procedure]?
>
> "Mr. Sampson: Not at all, but if I have what I would call ineffective counsel, I'm going to speak when I feel the need."

The trial justice once again patiently and carefully admonished defendant that he must respect the court's procedures and not speak out when he felt like it. Sampson's response was telling: "It just seems to me that everything has already been decided."

It is my opinion that at this point in the proceedings, defendant clearly was dissatisfied with the jury that was seated and was so obstreperous, that he had every intention to stop this proceeding. Defense counsel, after what in all likelihood was a stressful and difficult jury *voir dire*, informed the trial justice that he had cautioned defendant "at some length regarding his behavior in front of the jury." He stated:

> "I have explained to Mr. Sampson the voir dire process including the challenges for cause and [peremptory] challenges. I have advised Mr. Sampson in the strongest possible terms that he should conduct himself and comport himself accordingly as a defendant * * * in a Superior Court courtroom. I am concerned that Mr. Sampson may not follow my advice. Additionally, your Honor, I am aware of Mr. Sampson's dissatisfaction with me, acute dissatisfaction. I would ask the court—I don't really—I'm a little perplexed as to how I should proceed, but perhaps Mr. Sampson would like to represent himself and I could be standby counsel, I know there is some case law allowing that because I, quite frankly, don't know what to do or how to proceed at this point with respect to Mr. Sampson and his behavior in the courtroom. Every move I make, everything I do is highly criticized. I believe that if any lawyer were standing to Mr. Sampson's right, he would have the same objections that he's voicing to me. But it appears that everything I do, from motions to jury selection, which witnesses to call, which questions to ask, is going to be a problem, and I'm concerned about any potential outbursts in front of the jury, it is not good for Mr. Sampson not to be behaving as a gentleman in front of the jury, and he's hurting himself, and I'm concerned about that, and I don't know what to do, your Honor, at this point, other than what I have been doing and that is to represent him as best I can."

At this point, with a jury waiting to be sworn, the trial justice informed defendant that he had a constitutional right to represent himself should he wish to do so; he further stated that if defendant wanted to terminate the services of his lawyer, "the trial will still go forward, however, we need to have an extensive question and answer period where I make a determination just how knowing and just how voluntary your waiver of counsel is going to be."

"[The Court:] Would you like to represent yourself, Mr. Sampson?

"Mr. Sampson: Yes.

"The Court: You would?

"Mr. Sampson: Yes.

"The Court: Do you seek to terminate—

"Mr. Sampson: Yes.

"The Court: [Defense counsel's] services?

"Mr. Sampson: Right now.

"The Court: All right. Then, we need to have a dialogue, you and I. Why don't you go to the podium just so we can engage in our dialogue."

Thus began the second colloquy with this defendant, spanning two days, in which the trial justice advised defendant of the requirements of *Faretta*, 422 U.S. at 835, 95 S.Ct. 2525, and, although not constitutionally required, this Court's holding in *State v. Chabot*, 682 A.2d 1377, 1380 (R.I.1996). The trial justice engaged in a long and multifaceted discussion to determine whether defendant's waiver of counsel was knowing and voluntary. Interestingly, during this question-and-answer segment, defendant disclosed that he had studied law in prison, had appeared *pro se* in a prior criminal proceeding in which "[t]hey had somebody on standby." Mr. Sampson repeatedly declared that he was waiving counsel because he wanted to feel comfortable with his appointed counsel. He never declared that he wanted to terminate counsel's services to proceed without out a jury. Instead, he stated: "I just want to feel comfortable. I don't feel comfortable with this guy. So, the way it has to go is the way it [has] to go." The defendant's list of grievances about counsel was elastic and designed, in my opinion, to inject error into this record.

When the trial justice gently advised Sampson that it was unwise for him to undertake to represent himself, defendant declared: "Not with this gentleman, sir. Not * * * with him. No disrespect."

During this dialogue, not a single word was spoken about defendant's desire to waive a jury. The ever-patient trial justice declared a recess, sent the jury home and continued his colloquy with defendant about "this very, very important decision."

After the jury was excused, the trial justice reminded Sampson that there would be a one-day recess of the trial during which defendant was directed to meet with his attorney, review the relevant case law concerning the question of a valid waiver of counsel, and reflect on this decision. During this discussion, defendant disclosed to the trial justice that he was familiar with some of the pertinent case law relative to the waiver of counsel, including *Faretta* and *State v. Bluitt*, 850 A.2d 83, 90 (R.I.2004), in which this Court vacated a conviction based on our conclusion that the defendant did not make a knowing and voluntary waiver of counsel. The defendant also was familiar with the trial justice in *Bluitt*, who was the hearing justice in this case.

"Mr. Sampson: The *Bluitt* case, sir, is that the case that [the hearing justice] [p]resided on?

"The Court: *Bluitt* was, in fact, [the hearing justice's] case.

"Mr. Sampson: I have that case, sir.

"The Court: Have you read Faretta versus California?

"Mr. Sampson: A little bit, some pieces.

"The Court: * * * Now, is there anything else you would like to say?"

The defendant spoke about his dissatisfaction with the fact that there were no people of color on the jury:

"Mr. Sampson: First off, for the people that [were] involved, as far as, I mean the jury, there [are] no blacks in Coventry, West Warwick and East Greenwich? There's got to be a black family there somewhere.

"The Court: I would imagine Mr. Sampson, there are African American families that are somewhere within Kent County that are on that list. I don't have the master list. But I would imagine that there are, and your objections have already been noted."

The defendant also expressed his impatience with the need for any further colloquy on the question of whether his waiver of counsel was knowing and voluntary because he was firm and unwavering in his decision to terminate his lawyer. Although defendant placed a long list of grievances on the record, many of which concerned the hearing justice, none concerned the question of a bench trial:

"Just what is this discussion—because I already know what I want for a decision, sir, because I kind of feel as though this whole case, no disrespect to this [defense counsel], he was kind of thrown into this position by [the hearing justice] who no longer resides [sic] over the case, and I feel this is left over baggage, no disrespect to this gentleman. It is no disrespect at all. I'm sure [defense counsel] is one of the best that you have to offer. [The hearing justice] is on but he's off, but before he's off he entered stipulations, I can't enter Washington County where I have [the] best opportunity for jobs, he cuts me off * * *. I am being cut off by somebody who doesn't even sit at the seat at this present time, and before he leaves he tells me that he assigns this gentleman to me. To me it is kind of like a tag for where he left off. No disrespect. I don't feel comfortable."

When the trial justice informed defendant that he was free to retain his own counsel, Sampson responded:

"I just want to state for the record that I don't think I have the ability to actually represent myself. I don't have the money at this * * * time to be able to afford * * * counsel. I'm saying for the record that I don't feel comfortable with this scenario."

At this point, the trial justice continued the case one day, for defendant to think things over and be comfortable with his choice. Again, nothing was said about a bench trial; there is not a suggestion that defendant was seeking to discharge his counsel to waive his right to a jury trial, despite his vocal opposition to the panel that was seated. The trial justice repeatedly stressed that his chief concern was that defendant receive a fair trial, to which defendant responded:

"Because, I think if [a fair trial] is what you're looking for, if you're looking for ultimately right/wrong, then that is the way it should be. You know what I'm saying? I don't feel as though I should be—I don't want to be at least taken advantage of. If I'm guilty of something, so be it. But if I'm not guilty of it, let[ ] me move on with [my] life. I am trying to get my life together. I can't do it under these circum-

stances." [21]

Finally and most significantly, in what I perceive to be a transparent effort to inject error, defendant declared that the situation he was creating placed the trial justice in an untenable position:

"So, it is like a *Catch 22* because I'm just sitting in front of you today stating that I'm not able to do this, but at the same time I'm not confident with him as far as representing me." (Emphasis added.)

The defendant also suggested that because he was not capable of representing himself, the trial justice was, "kind of forcing [his] hand," to which the trial justice responded that if that were the case, he would deny the motion to withdraw. Sampson replied: "There you go. *All of this is being preserved?*" (Emphasis added.)

The trial justice then stated:

"Yes. I'm willing to do that. Your freedom is at stake with regard to a felony crime, and there are procedural issues and counsel has been appointed one way or the other, and [defense counsel] is going to be in the courtroom for the trial. Now, who makes the decisions, we're going to get to that on the record, but I want you to have some time to think about it because it is certainly a great weight upon your shoulders. We're not going to rush this, and tomorrow is a day off so there will be time to reflect. I note you've got a family member in the courtroom today, and certainly that will give you some comfort and strength, you shouldn't be alone when you have these kinds of weights on you Mr. Sampson. \* \* \* I've listened intently to everything that you have to say because certainly I'm

very sensitive to the fact that this is not fun, and I can assure you that no decision has been made by this jury as to— what your ultimate responsibility is in this case." (Emphasis added.)

When trial resumed two days later, nothing had changed. The defendant continued to persist in his decision that he did not want defense counsel to represent him, while at the same time suggesting that he was not capable of representing himself.

I pause to note that the ability to present a competent defense on one's behalf is not a factor to consider in determining whether the waiver of counsel is knowing and voluntary. If a motion to proceed *pro se* could be granted only upon a finding that the accused was capable of representing himself or herself adequately, then the motion invariably would be denied and the Sixth Amendment right to represent oneself would be rendered meaningless. *See Faretta,* 422 U.S. at 836, 95 S.Ct. 2525 (a defendant's "technical legal knowledge" is not "relevant to an assessment of his knowing exercise of the right to defend himself").

The third colloquy began with defense counsel stating the following:

"Your Honor, based on my conversations with Mr. Sampson, not only this morning but yesterday and prior to yesterday, Mr. Sampson, unequivocally and most arguably, does not want me to represent him in any way, shape or form, not as his lawyer, not as standby counsel, not as anything to do in a legal capacity as an attorney or counselor or lawyer. Mr. Sampson does not want [me] to represent him at all, in any way, shape or form. There is a lack of communication between Mr. Sampson and I to the extent that I have never experi-

---

**21.** The trial justice reminded defendant that there was an outstanding offer to plead to a reduced charge of simple assault. The offer was rejected.

enced before, and I've experienced quite a bit. Every single decision, strategic decision that I make, every motion that I file, every witness that I intend or do not intend to call, every question that I ask during voir dire, Mr. Sampson challenges and vehemently disagrees with. Mr. Sampson not only does not want me to represent him, he is also alleging, as he has on the record yesterday, and has alleged again this morning, ineffective assistance of counsel. He wants the record abundantly clear that I am an ineffective attorney and I am doing an ineffective job representing him.

"Additionally, Mr. Sampson would like to represent himself. He does not want me to be standby counsel. I have explained all of the case law to Mr. Sampson * * *. It is clear that Mr. Sampson has a Sixth Amendment right to represent himself, that he may proceed to defend himself as long as he voluntarily, intelligently, knowingly and competently decides to do so. The case law, your Honor is very familiar with. I will not reiterate the holdings, only to emphasize that defendants may, in fact elect to embark upon a foolish and reckless trial mission; however, they must do so with their eyes wide open * * *. * * * [T]he defendant in this case has had the benefit of counsel throughout the [pretrial] proceedings, not only the benefit of myself but also the benefit of [prior counsel]. * * * *It is just that now with the trial [underway,] the difference is the disagreements, the lack of communication on every single thing I do has just become that much more pronounced.*

"I did explain to Mr. Sampson that the record must indicate a willingness for him to represent himself *pro se.* He did on the record say yesterday, quote, I don't have the ability to represent myself, unquote. And quote, I am not real-ly capable of representing myself, unquote.

"The Rhode Island Supreme Court has addressed these issues before, particularly in the case of [*State v.*] *Bruyere,* 751 A.2d 1285 (R.I.2000), wherein the defendant, in fact, a former client of mine that fired me at the time of trial[,] * * * and he represented himself *pro se,* and his decision, despite his lack of technical legal training and skills, the decision in that case [was affirmed]." (Emphases added.)

The trial justice, yet again, engaged in a detailed colloquy with defendant, who continued to insist that his attorney was ineffective and that he wanted to terminate his services mid-trial:

"Your Honor, I have to have confidence with my counsel and I don't. So I feel as though I have to step up myself. I don't have, as I stated, I don't have the money for counsel. If I did, I would definitely do that."

The trial justice denied counsel's motion to withdraw and continued the *Faretta* inquiry. The defendant indicated to the trial justice that he intended to represent himself to the best of his ability. At the conclusion of this colloquy, defendant indicated that, although his lawyer wanted to proceed with a jury, he wanted "to go straight up against the judge." The following exchange occurred:

"The Court: You would rather go straight up against the judge?

"Mr. Sampson: Yes, sir.

"The Court: In other words, you would desire to proceed without a jury this morning; is that correct?

"Mr. Sampson: Yes, sir.

" * * *

"The Court: All right. Is there anything else that you would like to say just

with regard to terminating [defense counsel] and representing yourself?

"Mr. Sampson: No, sir.

" * * *

"The Court: * * * Now is your decision to terminate [defense counsel] based on any mistreatment or coercion by [defense counsel]?

"Mr. Sampson: Mistreatment?

"The Court: Has he mistreated you?

"Mr. Sampson: To some extent, yes.

"The Court: What has he done?

"Mr. Sampson: Tried to belittle me.

"The Court: In what way?

"Mr. Sampson: Control.

"The Court: I'm still not following you. Please be explicit.

"Mr. Sampson: Control of my life, you know what I'm saying? As far as what decisions I feel—as though a lot of the decisions that he made he didn't actually discuss-he just made a decision and my problem with that is *I have no problem with jurors taking over the case, but at least discuss what you're doing before you do it instead of telling me after you did it after you do it and then telling me there is nothing I can do about it.*

"The Court: Anything else, sir?

"Mr. Sampson: No.

" * * *

"The Court: It would seem that you just don't care for his advice; is that correct.

"Mr. Sampson: Yes, sir.

"The Court: I find your decision to waive counsel is both knowing and voluntary. We're going to proceed to the next issue that we need to take up. It is my understanding you would like to try this case without a jury; is that correct?

"Mr. Sampson: Yes, sir.

"The Court: So, you're prepared to waive your right to a jury?

"Mr. Sampson: Yes, sir." (Emphasis added.)

Thus, before he was permitted to discharge his counsel—mid-trial—and proceed *pro se,* defendant unequivocally declared: *"I have no problem with jurors taking over the case* [.]" (Emphasis added.) The record is abundantly clear that *after* defendant declared that he had "no problem" with a jury trial, the trial justice granted his motion to proceed *pro se.*

At this particular stage of the proceedings, I fail to see how it can be argued that defendant's waiver of counsel was not knowing and voluntary, based on the totality of the circumstances, including defendant's knowledge of the law, his experience with the criminal justice system and obvious motivation to inject error into this record. The majority's conclusion in this case that defendant was not presented with the option of "a bench trial, in accordance with his wishes, represented by counsel[,]" and therefore "he never knowingly, intelligently, and voluntarily waived his right to counsel" is, in my opinion, not supported by this record.

I am of the opinion that this defendant had grave disagreements with both attorneys who were appointed to represent him. I also agree with defense counsel that these objections would occur no matter who was sitting at counsel table. It is my belief that defendant did not seek to have his attorney discharged until after a jury whose composition was unsatisfactory to him was seated. Furthermore, it is my opinion that when a defendant declares, in open court, that he has "no problem" with jurors "taking over the case," the trial justice is entitled to rely on that statement.

The Sixth Amendment to the United States Constitution guarantees the accused the right to counsel and the concomitant right to serve as his or her own lawyer,

notwithstanding the fact that the accused is ill-prepared and unqualified to do so. *Faretta*, 422 U.S. at 836, 95 S.Ct. 2525. The right to defend oneself "is given directly [by the Sixth Amendment] to the accused; for it is he [or she] who suffers the consequences if the defense fails." *Id.* at 820, 95 S.Ct. 2525. The Sixth Amendment is violated when counsel is thrust upon the accused because "[i]n such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists." *Id.* However, it has also been acknowledged that "when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. * * * This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative." *Id.* at 820–21, 95 S.Ct. 2525.

The trial justices in this state frequently are confronted with the tense and even hostile relationship between court-appointed counsel and their clients. A criminal proceeding—whether a trial or violation hearing—in which an accused's freedom and future often are at stake, is a stressful event, rendered more difficult when a jury is waiting. Defendants often loudly complain about their court-appointed attorneys and demand another lawyer, or a continuance, or insist on proceeding *pro se.* Based on these well-known dynamics, this Court, understandably, has declared that an inquiry concerning whether a waiver of counsel is knowing and voluntary "must be pragmatic and directed to the 'particular stage of the proceedings in question.'" *State v. Spencer,* 783 A.2d 413, 416 (R.I. 2001) (quoting *Lopez v. Thompson,* 202 F.3d 1110, 1119 (9th Cir.2000)). In my view, the particular stage of the proceedings in this case that motivated defendant to discharge counsel arose after an unacceptable jury was seated. The trial justice was confronted with an unruly defendant, with a reputation for recalcitrance, who flatly refused to abide by the court's rules of decorum and whose counsel was at a loss about how to proceed. It is abundantly clear to us that this trial could not continue unless the trial justice granted defense counsel's third motion to withdraw—the first motion to which defendant consented. I think the trial justice, operating under some of the more stressful circumstances a trial justice encounters, got it right.

Because a motion to waive counsel has an impact on the defendant's Sixth Amendment rights, the court must engage in a careful dialogue with the accused before granting or denying the request. A defendant may elect to waive his or her constitutional right to counsel, but the court must be satisfied that the waiver is knowing and voluntary. *Spencer,* 783 A.2d at 418. If the motion is granted, defendant proceeds without counsel and has embarked on an imprudent course with an irresponsible client. *Id.* However, we have held that unless there is a record showing of good cause to refuse court-appointed counsel, the mid-trial termination of an attorney's services is "functionally equivalent to a voluntary waiver" of counsel. *Laurence,* 848 A.2d at 253 (quoting *Thornton,* 800 A.2d at 1025). In this case, defendant acknowledged that there was a disagreement about how the case should proceed. However, a defendant is not entitled to a new attorney simply because he disagrees with his lawyer's trial strategy. The Sixth Amendment does not guarantee a "right to counsel 'who would blindly follow [a defendant's] instructions.'" *Thornton,* 800 A.2d at 1029 n. 14 (quoting

*McQueen v. Blackburn,* 755 F.2d 1174, 1178 (5th Cir.1985)).

Accordingly and after examining the totality of the circumstances as I am required to do, I am satisfied that defendant made a knowing and voluntary waiver of counsel and did so with eyes wide open. It is my opinion that the conclusion of the majority's that defendant was deprived of his Sixth Amendment right to counsel is not supported by the record and is wrong. Consequently, I dissent.

### The Constitutional Challenge to the Child–Abuse Statute

I respectfully disagree with the conclusion of the majority that it "need not and do[es] not" address defendant's argument that the statute under which defendant faces a second trial, G.L.1956 § 11–9–5.3, is void for vagueness. Because the Court is remanding this case for a new trial, defendant is forced to undergo a second trial in which the constitutionality of the statute under which he is charged remains unresolved. I cannot recall any other case in which this Court has vacated a conviction and ordered a new trial, yet failed to address the constitutional validity of the enactment under which the accused was charged.

Jeopardy has attached in this case. Because this was a jury-waived case, I would vacate the judgment and remand the case to the trial justice for a determination—based on the existing record—whether the state has established that the child's injuries rose to the level of "serious physical injury" as set forth in § 11–9–5.3(b)(2). *See State v. DiPetrillo,* 922 A.2d 124, 137 (R.I.2007) (after this Court vacated the conviction based on an error of law by the trial justice in a jury-waived trial, the case

was remanded for additional findings by the trial justice, in accordance with our decision on the questions of law). Instead, there will be a new trial, affording the state a second opportunity to prove the elements of the crime of second-degree child abuse, including the degree of seriousness of the injury in this case.

I also respectfully disagree with the observation of the majority that the Attorney General's proposed legislative amendments to the child-abuse statute, § 11–9–5.3(b)(2), as disclosed by the state during oral argument, "would essentially mean that second degree child abuse requires the same conduct as that described and defined by this Court in *State v. Thorpe,* 429 A.2d 785 (R.I.1981)—a case in which the defendant was charged with simple assault and battery, a misdemeanor rather than a felony." In addition to my reticence about commenting on matters that may be pending in the General Assembly—I do not believe that this is an appropriate role for the Court—the majority's observation is incorrect. The misdemeanor crime of simple assault does not require physical injury. Also, an essential element of second-degree child abuse—under either version—is the imposition of excessive corporal punishment, an element that is not included in the crime of simple assault.

Should the Legislature revisit § 11–9–5.3(b)(2) and adopt an amendment that brings it into conformity with the definition of "other physical injury" as set forth in § 11–9–5.3(d),[22] this definition would not implicate our holding in *Thorpe,* and the misdemeanor crime of simple assault would, in my opinion, remain a lesser-included offense, in cases in which a parent engaged in excessive corporal punishment that did not result in an injury or the

---

**22.** General Laws 1956 § 11–9–5.3(d) provides, "For the purpose of this section, 'other physical injury' is defined as *any injury,* other than a serious bodily injury, which arises other than from the imposition of *nonexcessive corporal punishment."* (Emphases added.)

injury was *de minimis.* Thus, because in accordance with *Thorpe,* a parent is privileged to impose nonexcessive corporal punishment as that concept has been described, it is only the application of excessive force, coupled with a physical injury that is addressed in the child-abuse statute. Accordingly, for the crime of second-degree child abuse, *Thorpe,* is inapposite.

My reading of § 11–9–5.3 and *Thorpe* leads me to conclude that simple assault is a lesser-included offense to the felony assault charges set forth in the child-abuse statute and defined as first-degree child abuse (serious bodily injury) and second-degree child abuse (serious physical injury). The lynchpin of either offense is an injury that arises from the imposition of excessive corporal punishment, an element that simply is not required for the misdemeanor offense of simple assault. In accordance with our holding in *Thorpe,* a parent may inflict only nonexcessive corporal punishment on a child. The use of excessive corporal punishment removes the parental protections found in *Thorpe,* 429 A.2d at 788.

The degree of force that is acceptable and thus, nonexcessive, varies "in relation to the sensitivity and character of the child [and] the child's age, sex, physical condition, as well as in relation to the particular offense for which punishment is to be meted out." *Thorpe,* 429 A.2d at 788. If the punishment is excessive or unreasonable, the parent is subject to criminal liability. *Id.* When "a parent ceases to act in good faith and with parental affection and acts immoderately, cruelly, or mercilessly with a malicious desire to inflict pain," then the parental right to impose corporal punishment vanishes and the parent has committed a criminal offense. *Id.* Finally, if an injury arises from excessive corporal punishment and the injury is deemed serious,

then the parent is guilty of second-degree child abuse.

Accordingly, for the reasons set forth herein, I respectfully dissent from the decision of the majority.